JESÚS GARCÍA OYOLA y OTROS, recurrentes, *v.* JUNTA DE CALIDAD AMBIENTAL, recurrida.

*Número:* AT-95-2          *Resuelto:* 21 de febrero de 1997

---

[3] Nuestro criterio coincide con el disenso del Juez de Apelaciones, Hon. Rossy García.

*Armando Cardona Acaba* y *Jéssica Rodríguez Martín*, abogados de la parte recurrente; *Blanche González Hodge, Mónica Ballestero Pascual, Orlando Puldón Gómez, Eduardo González Isales* y *David Bernier Velázquez*, abogados de la parte recurrida; *Juan Villafañe López, Arsenio A. Ramos Hernández* y *Juan A. Pérez López*, abogados de la Autoridad de Energía Eléctrica, interventora.

PER CURIAM: Una vez más debemos armonizar y sopesar el interés ciudadano y la política pública de preservar áreas de gran valor ecológico, mantener un ambiente —aire, agua y playas— limpio y proteger las especies marinas y terrestres, frente de la necesidad del Estado de construir nuevas plantas para generar energía eléctrica y suplir la demanda continua del sector privado e industrial y mantener, así, la posición competitiva del país para su desarrollo económico.

I

El 18 de agosto de 1993 la Autoridad de Energía Eléctrica (en adelante la Autoridad) sometió a la Junta de Calidad Ambiental (J.C.A.), conforme lo requiere el Art. 4(c) de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1124(c),([1]) una declaración preliminar de impacto ambien-

---

([1]) Dispone:

"Se ordena que al máximo grado posible se interpreten, implementen y administren todas las leyes y cuerpos reglamentarios vigentes en estricta conformidad con la política pública enunciada en este Capítulo. Así mismo, se ordena a los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades del Estado Libre Asociado de Puerto Rico y sus Subdivisiones políticas, que en la imple-

tal (en adelante DIA-Preliminar)([2]) referente a la construc-
ción proyectada de una planta para generar electricidad,
mediante la quema de aceite —petróleo— en el barrio
Cambalache de Arecibo.([3]) El proyecto es parte del plan de
contingencia de generación de la Autoridad.

El 24 de diciembre, en unión a la Junta de Planificación,
la J.C.A. emitió *un aviso público* para notificar la celebra-
ción de vistas públicas conjuntas sobre la ubicación, adqui-
sición del terreno y discusión de la DIA-Preliminar. Cele-
bradas el 24 y 25 de enero de 1994, depusieron ciudadanos,
legisladores, a través de sus representantes, y grupos
ambientalistas. La J.C.A. recogió ponencias escritas.

El 4 de abril, el Sr. Jesús García Oyola y otros solicita-
ron que se dejaran sin efecto las vistas públicas celebradas,
pues no se publicaron los *dos (2) avisos públicos requeridos*

---

mentación de la política pública de este Capítulo, cumplan con las siguientes
normas:

.        .        .        .        .        .        .

"(c) Incluir en toda recomendación o informe propuesta de legislación y emitir,
antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental
que afecte significativamente la calidad del medio ambiente, una declaración escrita
y detallada sobre:

"(1) el impacto ambiental de la legislación propuesta, de la acción a efectuarse
o de la decisión a promulgarse;

"(2) cualesquiera efectos adversos al medio ambiente que no podrán evitarse si
se implementare la propuesta legislación, si se efectuare la acción o promulgare la
decisión gubernamental;

"(3) alternativas a la legislación propuesta, o a la acción o decisión guberna-
mental en cuestión;

"(4) la relación entre usos locales a corto plazo del medio ambiente del hombre
y la conservación y mejoramiento de la productividad a largo plazo, y

"(5) cualquier compromiso irrevocable o irreparable de los recursos que esta-
rían envueltos en la legislación propuesta si la misma se implementara, en la acción
gubernamental si se efectuara o en la decisión si se promulgara.

"Se faculta a la Junta de Calidad Ambiental para aprobar reglamentos para
implementar las disposiciones de este inciso." (Énfasis suplido.) 12 L.P.R.A. sec.
1124.

([2]) Se requiere la preparación de una declaración preliminar de impacto am-
biental (en adelante DIA-Preliminar) para toda acción que pueda afectar significati-
vamente la calidad ambiental. Reglamento sobre Declaraciones de Impacto Ambien-
tal de Puerto Rico, Junta de Calidad Ambiental, 4 de junio de 1984, Sec. 5.2.1.

([3]) Se proyecta construir la planta en un predio de cincuenta y dos (52) acres,
perteneciente a una finca de Seiscientas (600) cuerdas de la Autoridad de Tierras,
conocida como la Ciénaga Tiburones. Dicho predio colinda por el norte con el Río
Grande de Arecibo, por el sur con el Caño Suroeste, por el este con terrenos de la
Autoridad de Tierras y por el oeste con la carretera estatal Núm. 681.

536

*por reglamento.* En reunión de 14 de abril, la J.C.A. decidió celebrar una nueva vista el 22 de julio.(⁴) No fue cuestionada.

En síntesis, los deponentes señalaron, *primero*, que el predio donde ubicaría el proyecto es el *humedal*(⁵) *de agua dulce más grande de Puerto Rico. Segundo*, dicho predio ha sido propuesto para designación como reserva natural en el Programa de Manejo de la Zona Costanera. *Tercero*, la presencia de seis (6) especies en peligro de extinción(⁶) y otras seis (6) próximas a ser clasificadas así. *Cuarto*, debido a que el combustible —petróleo— sería entregado por mar en el puerto de Arecibo,(⁷) y luego conducido a la planta por una tubería y oleoducto, destacaron que dicho puerto tiene, en la actualidad, una profundidad de veintiún (21) pies y que una barcaza cargada con aceite tiene un calado de diecinueve punto setenta y cinco (19.75) pies. Por ello, sostuvieron que el proyecto requería un dragado regular, lo que podría afectar la vida marina e industria pesquera del área. Y *quinto*, expusieron su preocupación sobre posibles derrames a causa del fuerte oleaje de la bahía.

*En respuesta a las ponencias de la ciudadanía y señalamientos de la J.C.A.*, la Autoridad preparó y presentó un

---

(⁴) Depusieron diecinueve (19) ciudadanos, *algunos en su carácter individual y otros en calidad representativa de organizaciones cívicas y ambientalistas.* Diecisiete (17) de éstos expresaron su oposición o preocupación, o ambas cosas, sobre el proyecto y el impacto ambiental que tendría éste sobre el área.

(⁵) Humedales son "ecosistemas ... de gran importancia por la producción de peces y por ser habitáculos de vida silvestre y de especies en peligro de extinción. Ellos actúan además, como reguladores del flujo de agua de lluvia, reducen el efecto de inundaciones, sirven de filtro de sedimentos y absorben grandes cantidades de nitrógeno y fósforo provenientes de los abonos agrícolas ... poseen grandes extensiones de manglares ... una riqueza inmensa en cuanto a flora y fauna. El 50% de las familias de aves reconocidas en Puerto Rico viven en estas áreas costaneras". Solicitud de revisión, Apéndice, pág. 011. Expresiones del Sr. Héctor Russe Martínez, Presidente de la Junta de Calidad Ambiental (en adelante J.C.A.) en la primera Conferencia Taller sobre Protección de Humedales en abril de 1994.

(⁶) Pelícano, Halcón Peregrino, Boa de Puerto Rico, Tortuga Verde, Carey de Concha y Manatí.

(⁷) En Carta de 28 de junio de 1994, la Autoridad de los Puertos reitera su posición, expresada en Carta de 19 de enero de 1994, de que no objeta el proyecto ni el uso del puerto de Arecibo para recibir las embarcaciones que transportan combustible.

*suplemento* a la DIA-Preliminar y solicitó que dicho documento, en unión con la DIA-Preliminar, se consideraran como la declaración final de impacto ambiental (en adelante DIA-Final). Entregó, además, un suplemento del impacto sobre la calidad del aire que reveló que no será significativo a tenor con los estándares promulgados por la Agencia Federal de Protección Ambiental (en adelante E.P.A.).

El 26 de septiembre de 1994 el panel examinador ante el cual se celebró la vista de 22 de julio sometió a la J.C.A. su informe. *Éste expuso los nombres de los deponentes, un breve resumen de sus ponencias y cuáles fueron*, a su juicio, *las principales preocupaciones señaladas*. Concluyó y recomendó la aprobación del proyecto, *condicionado* a que se *substituyera la descarga desde barcazas por un sistema marítimo-terrestre en un puerto más seguro*.

El 7 de octubre de 1994 la J.C.A. resolvió que la Autoridad había cumplido con los requisitos del Art. 4(c) de la Ley sobre Política Pública Ambiental, *supra*,(⁸) en cuanto se realizó el proceso de evaluación de los posibles impactos ambientales del proyecto. Sin embargo, *un grupo de residentes de Arecibo* solicitó reconsideración el 1ro de noviembre.(⁹) El 17 de noviembre —notificado el 25— la J.C.A. reiteró su dictamen.

El 20 de diciembre, García Oyola y otros solicitaron revisión ante el entonces Tribunal Superior, Sala de San Juan.(¹⁰) La J.C.A. y la Autoridad presentaron mociones de desestimación por separado. Cuestionaron la jurisdicción

---

(⁸) Fundamentó su conclusión en que se preparó la DIA-Preliminar, un suplemento y que se celebraron vistas públicas.

(⁹) Adujeron que la J.C.A. no tomó en consideración los argumentos que no apoyan el proyecto: el efecto sobre diecinueve (19) cuerdas de humedales y los terrenos por donde pasará el combustible desde el puerto hasta la planta; el efecto sobre la playa de Arecibo de los posibles derrames, del dragado y que se violaba la política pública ambiental.

(¹⁰) Alegaron que la J.C.A. abusó de su discreción al encontrar adecuada la declaración de impacto ambiental sin haberla analizado y erró al concluir que la DIA-Preliminar y su suplemento cumplían con el Art. 4(c) (12 L.P.R.A. sec. 1124(c)) a pesar de que los comentarios e interrogantes presentadas por el público no fueron discutidos, contestados ni incorporados.

del tribunal, pues García Oyola y otros no habían solicitado reconsideración ante la J.C.A. en su carácter individual. Además, adujeron el incumplimiento con la Regla 6(B) de revisión de determinaciones administrativas ante el Tribunal Superior.

El 6 de febrero de 1995 el ilustrado foro de instancia, Hon. Ángel G. Hermida, J., declaró ambas mociones sin lugar. Concedió término para que las partes informaran cómo fue que el grupo de residentes compareció, y si durante el trámite administrativo se identificaron individualmente las personas naturales miembros de ese grupo y, en tal caso, si éstas explicaron su interés en el pleito.[11]

Con vista a la reglamentación para implantar la Ley de la Judicatura de Puerto Rico de 1994, Ley Núm. 1 de 28 de julio de 1994 (4 L.P.R.A. sec. 22 *et seq.*), luego de varios trámites, el caso fue trasladado y sometido a nuestra consideración.[12] Previa mostración de causa, con el beneficio y la comparecencia de las partes, resolvemos.

## II

En recta metodología adjudicativa, analicemos primeramente la legitimación activa o *standing* de García Oyola y otros. De su existencia depende que podamos revisar la determinación administrativa en cuestión. *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992).

■ Poseen legitimación activa aquellos que han sufrido un daño claro y palpable, no uno abstracto ni hipotético; cuando existe un nexo causal entre la causa de acción que se ejercita y el daño alegado, y, finalmente, si la causa

---

[11] La Autoridad de Energía Eléctrica compareció el 28 de febrero. La J.C.A. solicitó prórroga de diez (10) días el 24 de febrero; expirado dicho término, no compareció. Los recurrentes García Oyola y otros tampoco cumplieron con la orden.

[12] El 2 de marzo de 1995 el tribunal de instancia ordenó el traslado del caso al Tribunal Supremo, conforme la Orden Administrativa Núm. XII del Juez Presidente de 23 de enero de 1995. Mediante Memorándum de 21 de marzo, lo devolvimos para la preparación de un informe, a tenor con la mencionada orden administrativa y Memorando de la Directora Administrativa de los Tribunales de 16 de febrero de 1995.

de acción surge al amparo de la Constitución o alguna ley. *Asoc. Maestros P.R. v. Srio. Educación*, 137 D.P.R. 528 (1994), y casos allí citados.

■ La doctrina de legitimación activa se interpreta amplia y liberalmente cuando la demanda es contra las agencias y los funcionarios gubernamentales. La persona afectada por una acción gubernamental no tiene que demostrar daño económico; puede basarse en consideraciones *ambientales, recreativas, espirituales o aun simplemente estéticas. Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974).

García Oyola y otros tienen capacidad jurídica para instar este recurso. Aunque en la moción de reconsideración se identificaron como un grupo de residentes de Arecibo, los documentos identifican, individualmente, a los miembros del grupo. La propia J.C.A., en su Resolución de 17 de noviembre de 1994, mencionó las personas que depusieron en la vista de 22 de julio de 1994.([13]) Además del informe enviado por el panel examinador a la J.C.A., surge que el *interés de ellos responde a legítimas consideraciones ambientales, estéticas y de salud.*

Existe una relación entre el *daño alegado* y la determinación de la J.C.A. Además, el recurso presentado surge al amparo de la Ley sobre Política Pública Ambiental.

Adviértase, que al evaluar estos reclamos no intervenimos indebidamente con el funcionamiento de la Rama Ejecutiva. No se pretende paralizar una obra, sino asegurar que se cumpla con los requisitos estatutarios de estirpe constitucional, garantizar la conservación del ambiente y la salud de los ciudadanos afectados.

## III

Superada la cuestión de justiciabilidad, examinemos los méritos. De entrada señalamos que *la alternativa de no*

---

([13]) Entre ellos, García Oyola, identificado como Presidente del Comité Asesor del Centro de Arecibo de la Corporación de Servicios Legales.

*construir la planta debe quedar subordinada a la necesidad del Estado de suplir energía al pueblo. Lo importante es minimizar sus efectos negativos sobre el ambiente.*

■ Las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto, si están sostenidas por evidencia sustancial. *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 D.P.R. 567 (1993); *Silva v. Adm. Sistemas de Retiro*, 128 D.P.R. 256 (1991); *Chase Manhattan v. Emmanuelli Bauzá*, 111 D.P.R. 708 (1981).

■ El transcrito Art. 4(c) de la Ley sobre Política Pública Ambiental, *supra*, requiere que la Autoridad, antes de efectuar cualquier acción o promulgar cualquier decisión que afecte significativamente la calidad del ambiente, le someta a la J.C.A. una DIA-Preliminar. *Salas Soler v. Srio. de Agricultura*, supra, pág. 720.[14]

■ "[D]eberán ser concisas, claras y precisas, y *deberán evidenciar que las agencias [A.E.E.] han efectuado el correspondiente análisis ambiental*". (Énfasis suplido.) Reglamento sobre Declaraciones de Impacto Ambiental de Puerto Rico Núm. 3106, 4 de junio de 1984, Junta de Calidad Ambiental, Sec. 1.2e(2). La J.C.A. determinará si su contenido es *adecuado* en cuanto al cumplimiento con el espíritu y la letra del Art. 4(c) de la Ley sobre Política Pública Ambiental, *supra*; Reglamento, *supra*, Sec. 5.313. "Si considerasen incompleta una Declaración podrían señalarlo. Si abrigaran dudas sobre algunos de sus datos o juicios, podrían expresarlas. Si considerasen que lo propuesto no es aconsejable desde el punto de vista ambiental, podrían afirmarlo. Pero ahí acaban sus funciones." Manual para la Preparación, la Evaluación y el Uso de las Decla-

---

[14] Incluirá una evaluación de los efectos primarios y secundarios, positivos o negativos, del proyecto propuesto sobre aspectos ambientales: el bienestar y la salud humana, uso de terrenos, infraestructura, calidad del aire y agua, minerales económicos, flora, fauna, suelos, áreas inundables, especies amenazadas o en peligro de extinción, niveles de sonido, áreas de valor histórico, arqueológico o estético. Reglamento, *supra*, Sec. 5.3.6a.

raciones de Impacto Ambiental, aprobado por la Junta de Calidad Ambiental, 19 de diciembre de 1972, pág. 2.

## IV

La J.C.A. sostiene que su función se circunscribe a comentar sobre la adecuacidad procesal y de contenido de la DIA-Preliminar, o sea, si considera o no aquellos posibles impactos ambientales del proyecto propuesto. Aduce que no tiene facultad para pasar juicio sobre si la DIA-Preliminar discute satisfactoriamente los posibles efectos conforme lo requiere el Art. 4(c) de la Ley sobre Política Pública Ambiental, *supra*. No tiene razón.

■ Notamos que la propia ley la faculta a expedir órdenes de hacer, de no hacer, de cese y desistimiento para que se tomen las medidas preventivas o de control necesarias a juicio de la J.C.A. para lograr sus propósitos; solicitar que se le notifique antes de comenzar una construcción, instalación o establecimiento de posibles fuentes detrimentales al ambiente y los recursos naturales, según éstos sean señalados en los reglamentos, que al amparo de la ley se emitan, y solicitar, dentro de los treinta (30) días de haber recibido la notificación, como condición previa a la construcción, la presentación de planos, especificaciones o cualquier otra información que juzgue necesaria para determinar si la propuesta construcción, instalación o establecimiento está de acuerdo con la ley y sus reglamentos; y emitir órdenes provisionales, previa notificación a la Junta de Planificación prohibitorias de la construcción de instalaciones cuyos planos y especificaciones demuestren que hay violación a la ley y a sus reglamentos. 12 L.P.R.A. sec. 1131(22)(24)(25).

Se colige, pues, que la función de la J.C.A. se extiende a velar por el fiel cumplimiento de la política pública y los requisitos procesales y sustantivos contenidos en la ley y en los reglamentos aprobados a su amparo.

Precisamente, García Oyola argumenta que la J.C.A. no

cumplió su encomienda de analizar la adecuacidad del contenido de la DIA-Preliminar, conforme lo requerido en el Art. 4(c) de la Ley sobre Política Pública Ambiental, *supra*, limitándose ésta a exponer las características del proyecto sin evaluar sus consecuencias ambientales. Además, que ni la DIA-Preliminar ni su suplemento incorporaron las preocupaciones e interrogantes de los deponentes. Evaluemos.

## V

Tanto la DIA-Preliminar como su suplemento contienen un análisis adecuado de los efectos del proyecto en el bienestar y salud humana. Discute los efectos de las emanaciones de azufre en el aire a causa de la quema de combustible, cómo se minimiza la contaminación y se establecen medidas concretas. El suplemento considera el uso de un aceite con menos contenido de azufre para adecuar las emanaciones a los estándares permitidos por la E.P.A.[15]

Sobre los humedales, la DIA-Preliminar señala que las dieciocho punto nueve (18.9) cuerdas que se utilizarán para el proyecto serán una pérdida irreversible de ese valor ecológico. Sin embargo, el suplemento propone un plan de mitigación en el que se propone restaurar veinte (20) acres, crear un canal, nivelar el terreno para permitir la sobrevivencia de los mangles y sembrar treinta y ocho mil (38,000) mangles para mejorar el valor ecológico del área.

Evalúa también, satisfactoriamente, los efectos y las medidas previsorias en caso de un derrame de petróleo en la bahía o en la planta.[16] Además, el suplemento acogió

---

[15] Se visualiza utilizar un aceite combustible número dos (#2) con un contenido de azufre de cero punto quince por ciento (0.15%), más limpio y menos contaminante que el propuesto originalmente, que contenía cero punto cinco por ciento (0.5%) de azufre. La Autoridad de Energía Eléctrica (en adelante la Autoridad) aclaró que no consideró el aceite combustible número dos (#2) originalmente por no estar disponible en el mercado local al momento en que se presentó la DIA-Preliminar. Añadió que las turbinas del proyecto estarán diseñadas para que se pueda utilizar el combustible fósil más limpio, una vez la infraestructura esté disponible en la Isla.

[16] Se utilizarán, en todo momento, barreras flotantes desplegables para contener derrames de aceite para rodear las embarcaciones que transportan combustible una vez atraquen en puerto. También la Autoridad, preparó un Plan de Prevención y

varias de las recomendaciones de los deponentes. Así, ante los señalamientos del Departamento de Recursos Naturales y la comunidad sobre la pérdida de presión de agua, la Autoridad decidió utilizar pozos de agua fuera del lugar del proyecto, a unas tres punto dos (3.2) millas de la costa.

Conforme la DIA-Preliminar, la presencia de especies amenazadas o en peligro de extinción en el área del proyecto fue evaluada en coordinación con agencias federales y estatales.[17] El estudio no reveló la existencia de ninguna especie señalada o propuesta alguna para marcar en el área del proyecto. *Se encontró, no obstante, la presencia de seis (6) especies en peligro de extinción en la vecindad del predio.* No encontraron habitáculos de estas especies en el área evaluada. Además, se identificó siete (7) especies que podrían encontrarse en el área adyacente,[18] pero tampoco tienen habitáculos en el área propuesta para el proyecto.

Finalmente, la Autoridad no cuestiona que para mantener el muelle del puerto de Arecibo con una profundidad que permita la entrada segura de barcazas de aceite es menester dragarlo periódicamente. Ahora bien, sostiene que no le corresponde realizar los estudios ambientales sobre el impacto en la vida marítima del dragado, pues, *primero* —por mandato de ley federal, le corresponde hacer el dragado al Cuerpo de Ingenieros del Ejército de Estados

---

Control de Derrames y Contramedida, un Manual de Operación, un Plan de Emergencias y un Plan de Reacción de la Facilidad ante Situaciones de Derrame, conforme la Ley de Contaminación por Aceite de 1990, *Oil Pollution Act.*

Más aún, para asegurarse de que las barcazas entren al puerto sólo cuando las condiciones del tiempo lo permitan, la Autoridad construirá un área de almacenaje de combustible con capacidad para sesenta (60) días, lo que permitirá programar las entregas en períodos de buen tiempo y continuar la operación normal cuando el mal tiempo y las altas marejadas no permitan la entrada a puerto.

Finalmente, la estación de descarga se construirá de concreto y contendrá un área de pozo para contener cualquier posible derrame e impedir que llegue al puerto.

[17] Consultaron la Oficina Regional del Caribe del Servicio de Pesca y Vida Silvestre de Estados Unidos, el Servicio Nacional de Industrias Pesqueras y el Departamento de Recursos Naturales de Puerto Rico.

[18] Entre éstas, se encuentra la ballena de aleta, la ballena jorobada, el cachalote, el peje blanco, el tinglar y el cabezón.

Unidos y, *segundo*, se requiere el dragado periódico, aunque no se construya el proyecto. Tiene razón.

El expediente ante nos contiene evidencia sustancial para sostener las determinaciones de la J.C.A., órgano administrativo especializado. Se confirma su Resolución de 6 de octubre de 1994.

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Hernández Denton emitió una opinión disidente, a la cual se unieron la Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Fuster Berlingeri.

— O —

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton, a la cual se unen la Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Fuster Berlingeri.

A tenor con lo requerido por el Art. 4(c) de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1124(c), la Autoridad de Energía Eléctrica (en adelante Autoridad) sometió una declaración Preliminar de impacto ambiental (en adelante DIA-Preliminar) sobre la construcción de una planta para generar energía eléctrica en Arecibo. Como resultado de la construcción de la planta propuesta se destruirán los humedales de agua dulce más grandes de Puerto Rico, ubicados en el área conocida como Caño Tiburones y se causaría un daño ecológico significativo a un área costera crítica para la vida silvestre. En violación de los procedimientos dispuestos por la Ley sobre Política Pública Ambiental, la Junta de Calidad Ambiental (en adelante Junta) no exigió que la Autoridad preparara una declaración final de impacto ambiental y le permitió preterir el ordenamiento procesal y sustantivo sometiendo únicamente una declaración preliminar. Como la Autoridad no

cumplió estrictamente con los procedimientos vigentes, revocaríamos la decisión de la Junta.

Además, la Junta no cumplió con su obligación de requerir que la Autoridad examinara otras alternativas energéticas al proyecto y limitó su intervención a resumir y comentar superficialmente la declaración preliminar presentada por la Autoridad. Considerando la importancia ecológica de los humedales que serán destruidos y la naturaleza del proyecto propuesto por la Autoridad, el Tribunal comete un grave error cuando confirma la decisión de la Junta bajo la premisa de "que la alternativa de no construir la planta debe quedar subordinada a la necesidad del Estado de suplir energía al pueblo". (Énfasis suprimido.) Opinión *per curiam*, pág. 542. A tenor con la política pública del país, y considerando el daño ecológico y el impacto ambiental de la planta, tenemos la obligación de requerir que tanto la Junta como la Autoridad examinen con rigor científico las alternativas energéticas existentes para satisfacer las necesidades del país sin destruir terrenos de gran valor ambiental. Disentimos.

I

Al evaluar el recurso presentado por el Sr. Jesús García Oyola y otros residentes de Arecibo, somos conscientes de que nuestra Constitución expresamente dispone que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad ...". Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1, pág. 379.

Con el propósito de cumplir con este mandato constitucional, la Asamblea Legislativa aprobó la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970 (12 L.P.R.A. sec. 1121 *et seq.*). Al promulgar esta ley la Asamblea Legislativa declaró que sería "política continua del Gobierno del Estado Libre Asociado ... en cooperación con las organizaciones públicas y privadas interesadas,

utilizar todos los medios y medidas prácticas ... para crear y mantener las condiciones bajo las cuales el hombre y la naturaleza puedan existir en armonía productiva y cumplir con las necesidades sociales y económicas y cualesquiera otras que puedan surgir con las presentes y futuras generaciones de puertorriqueños". 12 L.P.R.A. sec. 1123(a). Conscientes de que en el pasado la expansión industrial y el crecimiento poblacional habían afectado adversamente nuestros recursos naturales, se reconoció que todos los puertorriqueños debíamos disfrutar de un ambiente saludable y que había que lograr un balance entre las necesidades de la población y el uso de los recursos naturales. 12 L.P.R.A. sec. 1123(b)(5) y (6).

Considerando estos objetivos, evaluamos el recurso presentado por García Oyola y otros residentes de Arecibo partiendo de la premisa de que al suplir energía al país la Autoridad tiene también la obligación de asegurar que todos los puertorriqueños gocemos de un ambiente saludable. Esto significa que la Autoridad tiene que buscar y promover la alternativa propuesta con el menor impacto ambiental.

Por esta razón no podemos suscribir la premisa básica de la Opinión *per curiam* de que "la alternativa de no construir la planta debe quedar subordinada a la necesidad del Estado de suplir energía al pueblo". (Énfasis suprimido.) Opinión *per curiam*, pág. 542. Contrario a lo expuesto por el Tribunal, la política pública de la legislación vigente, tanto en Puerto Rico como en Estados Unidos, reconoce "la importancia crítica de restaurar y mantener la calidad medio ambiental ... para crear y mantener las condiciones bajo las cuales el hombre y la naturaleza puedan existir en armonía productiva y cumplir con las necesidades sociales y económicas [del país] ...". 12 L.P.R.A. sec. 1123(a). Nos corresponde a todos los puertorriqueños, y particularmente al Estado, dirigir nuestras acciones para tratar de lograr esta "armonía productiva" entre el hombre y su medio ambiente. Así evitamos la destrucción de nuestro medio

ambiente al amparo de la teoría de que la expansión industrial y energética tienen preeminencia sobre la naturaleza.

Claramente la premisa explícita de la Opinión *per curiam* del Tribunal es contraria a nuestro ordenamiento. Éste claramente le impone al Estado la obligación de "utilizar todos los medios prácticos, en armonía con otras consideraciones esenciales de la política pública" para "mejorar la calidad de los recursos renovables y velar por el uso juicioso de aquellos recursos que sufran agotamiento". 12 L.P.R.A. secs. 1123(b) y (b)(6). Además, reconoce "que toda persona deberá gozar de un medio ambiente saludable y que toda persona tiene la responsabilidad de contribuir a la conservación y mejoramiento del medio ambiente". 12 L.P.R.A. sec. 1123(c).

Aunque en términos sustantivos la obligación impuesta al Estado de "utilizar los medios prácticos" es esencialmente flexible, el estatuto contiene unas disposiciones procesales muy importantes que tienen que ser observadas estrictamente. Véase, a modo comparativo, *Calvert Cliffs' Coord. Com. v. United States A.E. Com'n*, 449 F.2d 1109 (Cir. D.C. 1971). A tales efectos se ordena a todos los funcionarios públicos que "al máximo grado posible interpreten, implementen y administren todas las leyes y cuerpos reglamentarios vigentes en estricta conformidad con la política Pública enunciada en este Capítulo". 12 L.P.R.A. sec. 1124. En otras palabras, a partir de su aprobación todas las entidades gubernamentales tienen la obligación de tomar en consideración, al "máximo grado posible", las consecuencias ambientales de sus actuaciones y sus decisiones.

Para asegurar un cumplimiento estricto con estos objetivos, la ley requiere que todas las agencias, corporaciones públicas, municipios e instrumentalidades del Estado preparen una declaración de impacto ambiental "antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente ...". 12 L.P.R.A. sec. 1124. Esta declaración no solamente ayuda a la agencia en su proceso decisional,

sino que también facilita que las otras entidades públicas y la ciudadanía estén debidamente informadas de las consecuencias ambientales de una acción considerada por el Estado y puedan fiscalizar efectivamente todas las etapas de la acción propuesta.

La ley exige que esta declaración sea por escrito y que esté preparada con "un enfoque sistemático interdisciplinario" que integre las ciencias naturales y sociales y la creatividad artística. 12 L.P.R.A. sec. 1124(a). En particular, deberá incluir información detallada sobre los siguiente extremos:

(1) el impacto ambiental de la legislación propuesta, de la acción a efectuarse o de la decisión a promulgarse;

(2) cualquiera efectos adversos al medio ambiente que no podrán evitarse si se implementare la propuesta legislación, si se efectuare la acción o promulgare la decisión gubernamental;

(3) alternativas a la legislación propuesta, o a la acción o decisión gubernamental en cuestión;

(4) la relación entre usos locales a corto plazo del medio ambiente del hombre y la conservación y mejoramiento de la productividad a largo plazo, y

(5) cualquier compromiso irrevocable o irreparable de los recursos que estarían envueltos en la legislación propuesta si la misma se implementara, en la acción gubernamental si se efectuara o en la decisión si se promulgara. 12 L.P.R.A. sec. 1124(c)(1)-(5).

Esta disposición establece un procedimiento que requiere que las agencias examinen cuidadosamente las consecuencias de sus acciones propuestas. Considerando lo expuesto en la Declaración de Principios de la Ley sobre Política Pública Ambiental, el procedimiento establecido en el Art. 4 (12 L.P.R.A. sec. 1124) tiene que ser cumplido estrictamente por las agencias e instrumentalidades del Estado. Dicho artículo no ordena un resultado en particular. Sin embargo, al ordenarle al Estado que "al grado máximo posible" interprete e implante la legislación, se establece claramente que hay que cumplir rigurosamente con sus preceptos cuando esté considerando una acción que afecte significativamente el ambiente. Consideraciones sobre las dificultades administrativas, demoras o

costos económicos de la declaración, no justifican el incumplimiento con sus disposiciones.

Para facilitar su fiscalización, el estatuto dispone que la declaración tiene que ser "escrita y detallada" y debe cumplir con los requisitos procesales y de contenido aprobados por la Junta de Calidad Ambiental. 12 L.P.R.A. sec. 1124(a) y (c). A tenor con la facultad concedida por el Art. 4 de la Ley sobre Política Pública Ambiental, *supra*, la Junta aprobó un Reglamento sobre Declaraciones de Impacto Ambiental (en adelante Reglamento) y un Manual para la Preparación, la Evaluación y el Uso de las Declaraciones de Impacto Ambiental (en adelante Manual). En éstos se dispone un procedimiento muy detallado sobre las declaraciones de impacto ambiental que consiste de cuatro (4) etapas.

En primer lugar, la Sec. 5.5.1 del Reglamento ordena a las agencias que preparen una declaración preliminar de impacto ambiental (DIA-Preliminar) "lo antes posible dentro del proceso decisional, según disposiciones de las Guías para la Preparación de DIAS, previo a establecer cualquier compromiso de naturaleza irrevocable de los recursos o del ambiente que grave la decisión final a tomarse". Claramente la DIA-Preliminar la tiene que preparar la agencia antes de una decisión final y antes de "cualquier compromiso de naturaleza irrevocable".

Copias de estas declaraciones tienen que remitirse a la Junta para su evaluación y a las agencias con ingerencia para sus comentarios. Sec. 5.5.2.1 del Reglamento, *supra*. Cuando la DIA-Preliminar sea circulada entre las agencias, la entidad proponente deberá notificar y ponerlas a la disposición del público para inspección y comentarios dentro de un término de treinta (30) días. Sec. 5.5.2.2, *supra*.

La Junta podrá celebrar vistas públicas sobre la DIA-Preliminar. Sin embargo, antes de celebrar estas vistas se tiene que notificar al público sobre su propósito, así como la fecha, hora y el lugar. Durante esta etapa la Junta o cualquier otra agencia podrán solicitar información adicional o un suplemento a la DIA-Preliminar.

Una vez celebre la vista y las partes interesadas hayan sometido sus posiciones, la Junta emitirá sus comentarios. Como la DIA-Preliminar no constituye una solicitud que requiera una autorización de la Junta, no se supone que ésta apruebe o rechace la declaración. Sin embargo, la Junta tiene la obligación de pasar juicio sobre si la DIA-Preliminar discute satisfactoriamente los efectos ambientales del proyecto. En particular tiene que examinar la validez científica de la información incluida por la agencia proponente e identificar las áreas que no han sido adecuadamente estudiadas.

Por último, como correctamente concluye la Opinión *per curiam*, pág. 544, la Junta tiene el deber ineludible de "velar por el fiel cumplimiento de la política pública y los requisitos procesales y sustantivos contenidos en la ley y en los reglamentos aprobados a su amparo". Por lo tanto, no puede limitar su intervención a meramente comentar o resumir el proyecto en cuestión sin ningún tipo de análisis fundamentado con rigor científico. La Junta tiene la obligación de someter esta declaración a un análisis crítico de carácter interdisciplinario.

Concluido este proceso, si la agencia proponente determina que la acción propuesta afectará sustancialmente la calidad del ambiente, deberá preparar una declaración final de impacto ambiental (en adelante DIA-Final) y ponerla a disposición del público. Esta DIA-Final tiene que ser preparada después de recibir los comentarios tanto de la Junta como de las otras agencias concernidas y el público. En esta declaración se supone que la agencia proponente evalúe los comentarios de las personas interesadas y exponga las razones por las cuales continúa con el proyecto o lo cancela. La ciudadanía tendrá entonces un término de treinta (30) días para evaluar la DIA-Final antes de que se pueda continuar con el proyecto. Sec. 11F del Manual, *supra*.

Aclarados los principios rectores de nuestra revisión y el procedimiento administrativo dispuesto por la Ley sobre

Política Pública Ambiental, examinemos los méritos del recurso ante nos.

## II

En síntesis, los peticionarios sostienen que la Autoridad no observó estrictamente el procedimiento referente a la preparación y trámite de una declaración de impacto ambiental y que la Junta no cumplió con su obligación de hacer una evaluación sistemática y multidisciplinaria sobre la DIA-Preliminar.

Del ordenamiento anteriormente descrito se desprende que al examinar una DIA-Preliminar la Junta debe, inicialmente, verificar que ésta incluya toda la información requerida por la Sec. 5.3 del Reglamento, *supra.* Luego, debe evaluar científicamente el contenido de la DIA-Preliminar para determinar si contiene una discusión adecuada de cada uno de los criterios dispuestos en el Art. 4(c) de la Ley sobre Política Pública Ambiental, *supra.* Por último, debe asegurarse de que la entidad proponente cumpla estrictamente con el procedimiento provisto en la ley, el Reglamento y el Manual, particularmente en lo referente a la notificación al público sobre los dos (2) tipos de declaraciones requeridos por la ley y el Reglamento.

En el caso de autos la Autoridad propone construir una planta para generar energía eléctrica mediante la combustión de petróleo. El proyecto estará localizado en el Sector Cambalache del pueblo de Arecibo en un terreno donde hay unos humedales inundables y en el cual hay considerable vida silvestre y especies en peligro de extinción. De los autos se desprende que este terreno es parte integrante de la Ciénaga Tiburones y es el humedal más importante y extenso de agua dulce de Puerto Rico. Su importancia es tal que el Departamento de Recursos Naturales ha sugerido que sea designado como una reserva natural.

Según lo requerido por la Ley sobre Política Pública Ambiental, la Autoridad preparó una DIA-Preliminar que fue sometida a la Junta de Calidad Ambiental. Mediante aviso

público la Junta de Planificación notificó la celebración de una vista pública relacionada con una consulta de ubicación y con la DIA-Preliminar. Sin embargo, contrario a lo dispuesto, la Junta de Calidad Ambiental no emitió ninguno de los avisos públicos requeridos.

La vista señalada por la Junta de Planificación se celebró los días 24 y 25 de enero de 1994 y comparecieron muchos ciudadanos para expresar su oposición al proyecto y cuestionar los hallazgos de la DIA-Preliminar.

En vista de la oposición de los peticionarios al proyecto, la Junta de Calidad Ambiental finalmente resolvió celebrar vistas públicas, pero las limitó a la consideración de un suplemento a la DIA-Preliminar presentado por la Autoridad. Esta nueva vista se celebró en julio de 1994 y allí comparecieron muchísimos ciudadanos a oponerse al proyecto. Dos (2) meses después de la celebración de estas vistas, el panel examinador sometió un breve informe que contiene un relato de los señalamientos de cada uno de los deponentes y recomienda que se apruebe la consulta de ubicación. Por su parte, la Junta de Calidad Ambiental emitió una escueta resolución (seis (6) páginas) en la cual se concluye que la Autoridad cumplió con la Ley sobre Política Pública Ambiental con la preparación de la DIA-Preliminar y su suplemento. Además, afirmó lo siguiente: "Queda ante la determinación de la Autoridad de Energía Eléctrica el determinar si la DIA–P y su suplemento constituyen la DIA-Final. No obstante, para tomar una determinación final sobre el proyecto deben asegurarse de que el mismo cumpla con la Política Energética de Puerto Rico." Apéndice, pág. 0045.

Del expediente no se desprende que la Autoridad preparó la declaración de impacto final requerida por la ley y el Reglamento. Todo lo contrario. Aunque el proyecto propuesto por la Autoridad claramente causará un daño ambiental significativo en un sector de gran valor ecológico, mediante la resolución antes descrita la Junta abdicó su poder fiscalizador y permitió que se pudiera preterir el trámite dispuesto. *Su omisión implícitamente autorizó que se*

*continuara con el proyecto sin preparar una DIA-Final y sin que se tuviera que responder al país por los daños previsibles.*

De esta manera, con un inusitado interés en acelerar los trámites del proyecto, *la Junta convirtió el proceso de consideración de una DIA-Preliminar en una DIA-Final y sin que el público tuviera una oportunidad de reaccionar, se le eximió a la Autoridad de cumplir con uno de los requisitos principales del ordenamiento procesal y sustantivo ambiental.* Por ende, la Autoridad fue totalmente eximida de preparar el documento medular del procedimiento dispuesto por la Ley sobre Política Pública Ambiental y en su lugar se le permitió utilizar un suplemento a la DIA-Preliminar como la DIA-Final.

De otro modo, al no existir una DIA-Final que respondiera a lo ocurrido, tanto en las vistas de enero de 1994 como en las de julio de ese año, se priva al público de una oportunidad real de impugnar y fiscalizar la construcción del proyecto.

Por otro lado, la Junta también erró al no analizar con rigor científico la DIA-Preliminar sometida por la Autoridad. En particular, la DIA-Preliminar contiene un análisis muy deficiente de las alternativas estudiadas por la Autoridad para atender las exigencias de energía eléctrica sin tener que construir otra planta que afecte adversamente los recursos naturales y el ecosistema ambiental de nuestra isla.

A tenor con nuestra política pública, la Junta tenía la obligación de requerir que la Autoridad considerara cuidadosamente otras alternativas para atender las necesidades energéticas del país, sin un sacrificio sustancial de nuestros recursos naturales limitados. De la propia resolución de la Junta se desprende que ésta nunca pasó juicio sobre el análisis de la DIA-Preliminar y su suplemento sobre las alternativas al proyecto propuesto. Sobre este extremo la resolución de la Junta de Calidad Ambiental no emite ningún criterio e ignora por completo este importante requisito de la ley.

Al examinar este proyecto, tanto la Junta como este Tribunal tienen la obligación de asegurar que los proponentes sean conscientes de que el futuro de nuestros recursos naturales depende de las decisiones que hoy tomamos. Tenemos que tener siempre presente que el desarrollo económico de este país está subordinado al uso eficiente de los recursos limitados que posee y que las decisiones que hoy tomamos sobre el uso que le daremos a esos recursos limitados determinarán nuestras posibilidades futuras de desarrollo económico y la calidad del ambiente en los años venideros. Si ignoramos esta realidad nos arriesgamos a que nuestros hijos no puedan ver y disfrutar las bellezas de la vida silvestre en áreas como la del Caño Tiburones en Arecibo y, además, los expongamos a los efectos de la contaminación ambiental que la planta propuesta ocasionaría de ser construida sin seguir el trámite procesal prescrito por ley y sin considerar otras alternativas de producción energética.

Podemos tomar conocimiento judicial de que las plantas de generación de energía eléctrica de ordinario contaminan el aire, el agua y el suelo, causando daños irreversibles a nuestro ecosistema. En este caso la planta se construirá sobre un terreno donde ahora hay un humedal de mucha importancia ecológica. Estos ecosistemas son de gran valor por la producción de peces y por ser habitáculos de vida silvestre y de especies en peligro de extinción. Éstos también ayudan a mitigar el efecto de inundaciones, sirven de filtro de sedimentos y absorben grandes cantidades de nitrógeno y fósforo que usualmente provienen de los abonos que se utilizan en la agricultura.

Por esta razón, el Departamento de Recursos Naturales expresó sus reservas al proyecto propuesto. En su Carta de 3 de marzo de 1994, el Secretario, Hon. Pedro A. Gelabert, analizó cuidadosamente el proyecto y propuso que se consideraran otras alternativas. Sobre el valor ecológico del lugar expresó:

... El área de ubicación es ambientalmente sensitiva. Luego de

una Determinación de Jurisdicción, el Cuerpo de Ingenieros de los Estados Unidos ha indicado que la finca es en su totalidad un humedal. El Caño Tiburones ha sido incluido como área costera crítica para la vida silvestre por el Departamento de Recursos Naturales. Es el humedal no-salino más grande de Puerto Rico. El Departamento de Recursos Naturales preparó un Estudio de Viabilidad de Restauración del Caño Tiburones donde señala que es posible la restauración del mismo. En el extremo este del caño existe un proyecto de inyección de industriales tóxico. Este proyecto, sumado a la planta propuesta, más la intrusión salina por bombeo excesivo de agua podrían anular cualquier esfuerzo por restaurar al lugar. Carta del Secretario del Departamento de Recursos Naturales al Sr. Luis Frías Taboas, Secretario, Junta de Planificación, 4 de marzo de 1994, Apéndice, pág. 0202.

Considerando lo expuesto por el Dr. Pedro A. Gelabert en su misiva a la Junta de Planificación, es realmente sorprendente que la Junta de Calidad Ambiental haya permitido que se continuara el proyecto sin requerir una DIA-Final bien fundamentada, particularmente en lo referente a la evaluación de otras alternativas, según lo propuesto por el Secretario de Recursos Naturales. No obstante, ignorando lo expuesto por el doctor Gelabert, la Junta de Calidad Ambiental y la Junta de Planificación autorizaron el proyecto, poniendo en peligro tanto los humedales del Caño Tiburón como la salud de los residentes de la ciudad de Arecibo.

Por último, al considerar el caso de autos no podemos olvidar que la Autoridad ha sido una de las empresas que más ha contaminado a nuestro país en las últimas cuatro (4) décadas. A modo de ejemplo, los residentes de Cataño son los mejores testigos del daño causado por la contaminación ambiental causada por la planta de energía eléctrica en Palo Seco. Por muchos años la Autoridad ha sido multada por la Agencia Federal de Protección Ambiental por su reiterado incumplimiento en dicha planta con la reglamentación ambiental. Como resultado de su incumplimiento craso con esta reglamentación muchas personas han padecido de enfermedades respiratorias en ese pueblo. A la luz de este historial tan nefasto de dicha corporación

pública, tenemos la ineludible obligación de asegurar que la Autoridad no construya otra planta de energía eléctrica sin que previamente se cumpla con el trámite evaluativo prescrito por la legislación vigente que es, en primera instancia, el mecanismo que tiene la ciudadanía para evitar que su construcción represente una amenaza para la salud pública de los residentes de Arecibo, y sin darle plena importancia a la política pública ambiental.

Desafortunadamente, la Opinión *per curiam* emitida por una mayoría del Tribunal permite que una vez más la Autoridad continúe ignorando los requisitos sustantivos y procesales de nuestro ordenamiento ambiental bajo el pretexto de que están atendiendo las necesidades energéticas del país. Cometemos un grave error al permitir que se continúe con este proyecto sin antes requerir que se exploren otras alternativas y que se cumpla estrictamente con los procedimientos establecidos para asegurar que la decisión final sea la más conveniente para todo el país. Por eso disentimos enérgicamente.