# 2002 DTA 142

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL I DE SAN JUAN, PANEL IV**

CARLOS HERNANDEZ PEREZ
Recurrente

v.

ADMINISTRACION DE LOS SISTEMAS DE RETIRO DE LOS
EMPLEADOS DEL GOBIERNO Y LA JUDICATURA
Recurrida

Núm. KLRA-2001-00759

San Juan, Puerto Rico, a 19 de septiembre de 2002

Panel integrado por su Presidente, el Juez Gierbolini,
y los Jueces Cordero y Rodríguez Muñiz

Rodríguez Muñiz, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Carlos Hernández Pérez (en adelante, el recurrente), presentó escrito de revisión el 30 de noviembre de 2001. Solicitó la revisión de la resolución emitida por la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (en adelante, la Junta de Síndicos) el 21 de junio de 2001 y notificada el 2 de octubre de 2001. De esa determinación, el recurrente solicitó reconsideración el 18 de octubre de 2001, la cual no fue acogida por la Junta de Síndicos.

Por los fundamentos que se exponen a continuación, se expide el auto solicitado y se revoca la resolución recurrida.

### I

El 4 de febrero de 1998, el recurrente presentó una solicitud para recibir una pensión por incapacidad ocupacional ante la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (en adelante, la Administración). El recurrente alegó haber sufrido dos accidentes en su trabajo en los años 1994 y 1995, respectivamente, mientras se desempeñaba como técnico automotriz de la Autoridad de Edificios Públicos.

El 20 de mayo de 1994, el recurrente sufrió una caída en el área de trabajo que le produjo una lastimadura en la región lumbar. El Fondo del Seguro del Estado le relacionó protusión central L1-L2 y fractura por compresión L1-L2". *Resolución Junta de Síndicos de 21 de junio de 2001*, a la página 34 del apéndice de la solicitud de revisión. Por la primera de esas lesiones, le concedió una incapacidad del veinte por ciento (20%) de las funciones fisiológicas generales y por la segunda, un diez por ciento (10%). *Id.*

El 1ro de febrero de 1995, el recurrente, accidentalmente, inhaló gas propano en su área de trabajo. Como consecuencia de ello, el Fondo le relacionó asma bronquial y le concedió un cuarenta por ciento (40%) de incapacidad de las funciones fisiológicas generales. El Fondo, además, hizo una relación de rinitis alérgica por la que concedió un cinco por ciento (5%) de incapacidad. *Id.*

El 22 de julio de 1999, la Administración notificó al recurrente que su solicitud de pensión había sido denegada. Determinó la Administración que la evidencia médica que obraba en el expediente demostraba que éste aún estaba física y mentalmente capacitado para desempeñar labores en el servicio público. **Véase** a la página 12 del apéndice de la solicitud de revisión.

El 19 de agosto de 1999, el recurrente solicitó reconsideración, por lo que el 21 de septiembre de 1999, la Administración celebró una vista. Una vez celebrada la misma, el 19 de enero de 2000, la Administración informó al recurrente que reafirmaba su determinación original. Junto con esa notificación, la Administración incluyó el informe preparado por el Oficial Examinador que presidió la vista. *Id.* a la página 14.

El 24 de febrero de 2000, el recurrente acudió mediante apelación a la Junta de Síndicos. Luego de varios incidentes procesales, la Junta celebró una vista el 3 de octubre de 2000. A la misma comparecieron los abogados de las partes y solamente declaró como testigo el recurrente. *Id.* a la página 36.

Una vez concluida la vista, el 21 de junio de 2001, la Junta emitió una resolución mediante la cual determinó que el recurrente no estaba total y permanentemente incapacitado para realizar cualquier trabajo en el servicio público. *Id.* a la página 48.

Inconforme con dicha determinación, el recurrente acude ante nos y señala el siguiente error:

*"Erró la Honorable Junta de Síndicos al aplicar la Ley y el Reglamento a los hechos del presente caso y al concluir que el apelante recurrente no está incapacitado, sin considerar adecuadamente la evidencia médica presentada en evidencia."*

## II

Mediante la resolución recurrida, la Junta de Síndicos realizó determinaciones de hechos que destacan la prueba considerada en el caso y las conclusiones, que a través de sus análisis, establecieron los organismos administrativos que intervinieron con ella. **Véase** a las páginas 36-44 del apéndice de la solicitud de revisión. Las mismas su resumen a continuación.

1. El 16 de febrero de 1995, a requerimiento del Fondo, el Dr. Alejo Luiña Portilla realizó un *"Pulmonary Function Test"* al recurrente, el cual concluyó: *"Severe obstructive lung dysfunction with air trapping. No response to Beth Agonist inhalation. There is also evidence of restrictive lung dysfunction."* *Id.* a la página 38.

2. Debido al diagnóstico de rinofaringitis irrelative primaria por inhalación de gas, el 7 de junio de 1995, se le recomendó al recurrente una cirugía de *"bilateral turbine tos mg (301.40); ethmoidutomia derecha (312.54) y st. Coldenel due (310.30)."* El informe no indica si dicha cirugía fue practicada. *Id.*

3. El 7 de noviembre de 1995, un informe radiológico del Fondo, reveló: *"Impression: Left ethmoiditis".* *Id.*

4. El 30 de octubre de 1995, el Dr. Héctor R. Stella Arrillaga, realizó un estudio al recurrente, llamado *"Tibral Somatosensory evoked potential"*, el cual concluyo: *"This is an abnormal set of tibial nerve somatosensory evoked potential studies. The asymmetry of the LS3 and P37 components might suggest a probable electro physiologic disturbance located at the primary sensory cortex. The asymmetry of the PF-LS3 and of the PF-P37 interpeak interval might suggest a probable lower spinal to cortical deficit."* *Id.* a la página 39.

5. Un examen radiológico del Fondo, de fecha de 29 de noviembre de 1995, reveló lo siguiente: *"The examination shows changes of sinusitis in the maxillary antra, bilaterally, with small retention cyst in the right maxillary antrum. Mild edema of the turbinate is seen in the left side. There is also evidence of mild inflammatory changes of the ethmoid cells and there is narrowing with partial obtruction."* *Id.* a la página 38.

6. El 19 de septiembre de 1996, el doctor Deliz, quien trataba al recurrente en el Fondo, rindió un informe que concluia: *"Mild airway obstruction is present. The response to bronchodilators indicates a reversible component. In addition, lung volumes are reduced indicating a concurrent restrictive process. Pulmonary function diagnosis: Poor cooperation; Mild obstructive airways disease-asthmatic type. Mild restriction; Arterial Blood Gases; Normal acid base balance and oxygen tension at rest."* *Id.* a la página 39.

7. El 6 de junio de 1997, el Dr. Américo Rodríguez Rivera rindió un informe a la Administración, en el cual destacó que había examinado al recurrente desde el 1 de noviembre de 1995 hasta el 20 de marzo de 1997. Su diagnóstico fue de: asma bronquial severa y rinitis alérgica; su prognosis fue reservada. *Id.*

8. El 17 de octubre de 1998, el Dr. Rafael Deliz preparó un *"Pulmonary Medical Report"*, en el cual indicaba que trataba al recurrente desde 1995, y que su diagnóstico era *"Severe Asthma[,] chronic sinusitis[,] allegic rhinitis."* Su pronostico es reservado. *Id.*

9. El 14 de enero de 1998, el Dr. Rafael Díaz Montaño, asesor médico de la Administración, hizo una revisión del expediente del recurrente relativo a su condición pulmonar, y destacó que éste *"tuvo una hospitalización por asma bronquial y varias visitas a sala de emergencias, tres ataques de asma por semana, algunas veces diarias,*

*usa Albuterol inhalador y hores, padece de sinusitis crónica y rinitis alérgica, hay pitos y expiración prolongada entre ataques. Para esa fecha había estado usando combivent/slow bid 200mg, Kenalog 40mg, Cef-L 500mg.; Azonacort PRN combiment." Id.* a la página 40.

El doctor Díaz Montaño recomendó que el recurrente fuera evaluado por la neuróloga y el neumólogo del sistema y luego le devolvieran el caso para él determinar incapacidad. *Id.*

10. El 11 de marzo de 1999, la Dra. Evelyn Rodríguez Ajá, neuróloga y asesora médica de la administración, evaluó médicamente al recurrente. Esta diagnosticó *"protusión de disco L1, L2 y 'status post' fractura L1, L2. Indica, además, entre otras cosas, que podía cargar, halar, empujar objetos de mediano peso, podía agarrar objetos pesados; entiende y recuerda instrucciones; y que podía sostener una pluma y escribir. Id.* a la página 38.

11. El 8 de abril de 1999, el Dr. Iván León, neumólogo del sistema, rindió un informe a la Administración en el cual resumió los siguientes datos: *"El accidente laboral fue en el 1995. Nunca ha intentado volver al trabajo a pesar de estar bajo manejo con neumólogo que le ha indicado que puede hacer su vida normal. El dice que no ha podido trabajar por lesión en la espalda. El Seguro Social le ha dado incapacidad." Id.* a la página 37.

12. El 2 de junio de 1999, el doctor Montaño, luego de las evaluaciones reseñadas en los párrafos 9 y 10, reevaluó el expediente del recurrente y determinó que *"el caso no llenaba el Listado ASR-125- 1.05 c-1-2 ni el 3.03A-B (302A-B)." Id.*, a la página 40.

13. El 13 de noviembre de 1999, el Dr. José R. Cuebas Vázquez revisó el expediente del recurrente y concluyó *"que aunque tenía un abultamiento discal a nivel lumbar no había deficiencia neurológica como requería la parte dos del listado 1.05 C1 y 2, por lo que no igualaba el 1.05 C1 y 2. También señaló que tampoco llenaba ni igualaba el listado 3.02 A por el FEVI para una estatura de 70"* según el listado era de 1.35 lo menos y él tenía 2.70. Además, señaló que no había evidencia **de ataques de asma** como lo requería el listado 3.00C por lo que no llenaba el listado 3.03B. *Id.* ▮

14. El 10 de octubre de 1998, la Administración del Seguro Social concedió la pensión por incapacidad al recurrente, retroactiva al 2 de febrero de 1995. La resolución recurrida destacó lo siguiente con respecto a esa decisión: *"[T]he claiment [sic] has significant lumbar, respiratory and mental disorders with severe and limit [ing] physical and mental symptoms. The claimant's conditions do not meet or equal, individually or combined listing severity. However, the claimant's impairments significantly compromise his working capabilities so as to preclude the performance not only of his prior work but any type of work o[f] substantial gainful activity even sedentary work, on a sustained basis. Hence a finding of disabled is warranted at step five of the sequential evaluation process since February, 1995." Id.* a las páginas 40-41.

15. El oficial examinador que presidió la vista de reconsideración de 4 de enero de 2000, determinó que aunque el recurrente tiene *"un abultamiento discal a nivel lumbar, no hay deficiencia neurológica como requiere la parte dos del listado 1.05, por lo tanto no llena 1.05 C1 y 2." Id.* a la página 37. Indicó además, que para una persona de 70" de tamaño, *"el listado requiere un FEVI de 1.35 lo menos, por lo tanto no llena ni iguala el listado 302a. Además no hay evidencia de ataques de asma como requiere el listado 3.00c, por lo tanto no llena ni iguala el listado 3.03 B." Id.* Este confirmó la decisión del Administrador. *Id.* a la página 37. ▮

16. La resolución recurrida indica que durante la vista administrativa celebrada por la Junta de Síndicos el 3 de octubre de 2000, el recurrente declaró que luego del accidente de 20 de marzo de 1994, el Fondo le dio alrededor de 30 terapias y le recetaron Flexeril y Relafen, y que el la actualidad aún padece de espasmos musculares, dolor continuo en las extremidades, se le adormecen las piernas. Toma celebrex 200mg dos veces al día y Flexeril todos los días. *Id.* a las páginas 41-42.

Tuvo que aprender a sentarse de nuevo, a comer, a abrir la nevera, a ir al baño, a bañarse y a levantarse y acostarse para no lastimarse. Si se lastima tiene que estar de una a tres semanas acostado sin levantarse y su esposa tiene que bañarlo, darle de comer y vestirlo. Se ha lastimado en cuatro ocasiones, la última vez fue en agosto de 2000. Los medicamentos lo ayudan a tolerar el dolor que es continuo. *Id.* a la página 42.

Sobre la condición pulmonar declaró que fue referido a un neumólogo porque desarrolló asma y rinitis. Dijo que estuvo hospitalizado de tres a cuatro veces. Lo operaron de los senos nasales, le recetaron oxígeno, máquinas de terapias y solumedrol. ██ Cuando lo hospitalizaron, cada hospitalización duró seis días. *Id.*

Actualmente toma los siguientes medicamentos: Slo-bid, Alegra, Alegra D, Combivent, Asmacort, Mucofen y Prednisome y la máquina de terapias todos los días. *Id.*

No puede correr ni caminar distancias, se cansa si sube o baja escaleras y le falta oxígeno. *Id.*

Mencionó que, aunque posee licencia de conducir, no lo hace porque no se siente capaz de hacerlo responsablemente, debido a que los medicamentos que toma le producen irritación y vértigo. Hace cinco años que no guía, su esposa y su madre lo llevan a las citas médicas. *Id.* a la página 43.

En el año 1999, fue hospitalizado dos veces por su condición asmática en el hospital El Buen Pastor. *Id.*

De un análisis de la evidencia que fue anteriormente resumida, la Junta de Síndicos determinó que *"el apelante tiene unas condiciones de salud que aunque limitan su funcionamiento en algunas situaciones no lo incapacitan para realizar todo trabajo en el servicio público." Id.* a la página 44.

### III

En su recurso de revisión, el recurrente señala que la determinación de la Junta de Síndicos es arbitraria, debido a que no toma en cuenta la totalidad del expediente médico y realiza una aplicación incorrecta de las leyes y reglamentos concernientes a la concesión de pensiones por incapacidad. En específico, destaca que resulta irrazonable que se determine que no está incapacitado cuando sufre de discos herniados, dolor persistente, asma crónica, alergias, sinusitis que requiere terapia respiratoria cuatro veces al día; que sufre de fatiga, no puede correr, subir o bajar escaleras, que no puede estar en contacto con ciertos tipos de químicos y que no puede guiar, ya que sus medicamentos le causan vértigo. *Escrito de Revisión,* a la página 8. Indica el recurrente que por esas razones fue incapacitado totalmente por el Comité de Factores Socioeconómicos del Fondo de Seguro del Estado y por la Administración del Seguro Social. **Véase** a las páginas 3 y 142 del apéndice de la solicitud de revisión.

El recurrente cuestiona, además, que la Administración de más peso a la revisión médica de los expedientes que a las evaluaciones y exámenes practicados por los médicos que han tenido contacto personal con él. *Escrito de Revisión,* a la página 8. El recurrente sostiene que de una evaluación completa del expediente surge suficiente evidencia para demostrar por preponderancia, que se encuentra incapacitado para trabajar. *Id.* a las páginas 8-9.

### IV

La Ley Núm. 447 de 15 de mayo de 1951, según enmendada, 3 L.P.R.A. secs. 761 *et seq.*, establece un sistema de retiro y beneficios para los empleados del Gobierno de Puerto Rico. El mismo es un estatuto remedial que persigue favorecer a los empleados cubiertos por el mismo. *Calderón v. Administración de los Sistemas de Retiro,* 129 D.P.R. 1020, 1031-32 (1992); *Morales Vda. De Cortés v. Administración de los Sistemas de Retiro,* 123 D.P.R. 589, 595 (1989).

Con relación a la anualidad por incapacidad ocupacional, el Artículo 9 de la Ley Núm. 447, 3 L.P.R.A. sec. 769, dispone, en lo pertinente, que:

*"Todo participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional, siempre que: (a) según se dispone en la sec. 771 de este título, se recibiere suficiente prueba médica en cuanto a la incapacidad mental o física del participante conforme a los criterios normalmente aceptados en el área de la compensación por incapacidad que mediante reglamento fije el Administrador; (b) el participante o el patrono, de acuerdo con los reglamentos de la Junta, notifique al Administrador con respecto a dicha incapacidad y la incapacidad fuere indemnizable de acuerdo con las disposiciones de las secs. 1 et seq. del Título 11."*

El Artículo 11 de la Ley, 3 L.P.R.A. sec. 771, en lo pertinente, dispone con relación a la incapacidad ocupacional, que:

*"Para los fines de una anualidad por incapacidad ocupacional o no ocupacional, se considerará incapacitado a un participante cuando la incapacidad esté sustentada con suficiente prueba médica conforme a los criterios normalmente aceptados en el área de la compensación por incapacidad que mediante reglamento fije el Administrador y dicha prueba revele que el participante está total y permanentemente incapacitado e imposibilitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado o para trabajar en cualquier empleo retribuido con retribución igual, por lo menos, a la que percibe. El Administrador, según lo crea conveniente y necesario, podrá requerir al participante que se someta a exámenes adicionales con médicos seleccionados por el Administrador."*

Los requisitos arriba reseñados fueron incorporados al reglamento adoptado por la Administración Para la Concesión de Pensiones, Beneficios y Derechos; Reglamento Núm. 4930 (en adelante, el Reglamento).

La Regla 24.2 de dicho Reglamento dispone que para tener derecho a una pensión por incapacidad ocupacional, debe establecerse, entre otros requisitos, que el participante ha presentado *"suficiente prueba médica en cuanto a [su] incapacidad mental o física"* y que el Fondo del Seguro del Estado ha determinado que la condición incapacitante está relacionada con el empleo del participante y es compensable. *Id.*

Por su parte, la Regla 24.4 señala que *"[s]e considerará capacitado al participante si no está totalmente y permanentemente incapacitado e imposibilitado para cumplir los deberes de cualquier empleo retribuido, con un sueldo o retribución, por lo menos igual a la que esté percibiendo."*

Sobre el particular, en *Sánchez v. A.S.R.E.G.J.*, 116 D.P.R. 372 (1985), el Tribunal Supremo de Puerto Rico expresó que *"[l]a incapacidad que obligue al retiro al empleado con derecho a la anualidad por incapacidad ocupacional debe ser de tal naturaleza que le inhabilite para desempeñar las funciones de su empleo y de cualquier otro empleo remunerativo". Id.*, a la página 376.

La Regla 24.4 del Reglamento dispone que:

*"Si de la evidencia médica que consta en el expediente y conforme al listado de criterios médicos ("Adult Listings") establecidos para determinar incapacidad y del análisis e investigación que realicen los técnicos en determinación de incapacidad designados por el Administrador, **no se pudiese determinar con certeza la incapacidad**, se le podrá requerir al participante que se someta a aquellos exámenes adicionales que se entiendan necesarios para adjudicar en sus méritos la petición por beneficios de incapacidad. Los exámenes médicos adicionales serán realizados por médicos seleccionados por el Administrador. Recibidos los resultados de dichos exámenes, el médico asesor hará la determinación final sobre la incapacidad y someterá su recomendación al Administrador."* (Enfasis suplido.)

Una incapacidad leve que limita las funciones de un empleado, pero que no le impide llevar a cabo las

funciones de su trabajo o de cualquier otro empleo remunerativo, no da base para recibir una pensión bajo el estatuto. *Sánchez v. A.S.R.E.G.J., supra*, a la página 376.

Los "*criterios médicos*" mencionados en la Regla 24.4 del Reglamento son aquellos adoptados por las autoridades federales bajo la Ley de Seguridad Social Federal, 20 C.F.R. Pt. 404, Subpt. P., App. I. **Véase** Reglamento Núm. 4930, R. 5.9.

En la jurisdicción federal, al determinar si un individuo se encuentra totalmente incapacitado para llevar a cabo su trabajo, dentro del contexto de la Ley de Seguridad Social Federal, se considera, no solamente si su impedimento es de tal naturaleza que le impide llevar a cabo sus funciones, sino además, si no puede llevar a cabo otro trabajo remunerativo, a la luz de "*su edad, educación y experiencia de trabajo.*" 42 U.S.C. sec. 423(d).

De acuerdo a la reglamentación adoptada bajo dicho estatuto, cuando el impedimento sufrido por una persona cumple cabalmente con los criterios médicos enumerados en el mencionado Apéndice I, la persona se considera incapacitada, sin necesidad alguna a hacer referencia a los factores socioeconómicos y vocacionales de edad, educación y experiencia. **Véase** 20 C.F.R. sec. 404.1520(d).

No obstante, si a base de los criterios enumerados en el Apéndice I, no se puede llegar a una determinación, entonces se evalúa la capacidad funcional de la persona para seguir llevando a cabo la tarea que tenía antes. 20 C. F.R. sec. 404.1520(e). Si no puede, entonces se evalúa su capacidad residual funcional para hacer otro trabajo remunerativo, a la luz de su edad, educación y experiencia previa. 20 C.F.R. sec. 404.1520(f).

Este esquema es consistente con el adoptado en nuestra jurisdicción bajo la Ley Núm. 477. Bajo el mismo, el cumplimiento o no con los criterios médicos enumerados en el Apéndice I de la Ley de Seguridad Social Federal no es necesariamente determinante de la cuestión de si el empleado está o no incapacitado. La referencia a dichos criterios es el primer paso de la pesquisa, pero no agota la misma. Si el empleado no cumple con los criterios del listado, entonces hay que determinar si la condición particular que tiene le permite seguir desempeñando las tareas del cargo específico que ocupaba y, de no ser así, si existe algún otro trabajo que podría realizar en el servicio del patrono o en cualquier otro empleo igualmente retribuido, a la luz de su edad, educación y experiencia de trabajo.

Por último, pertinente al caso de autos, el Comité de Factores Socioeconómicos es un cuerpo auxiliar permanente del Administrador [del Fondo] integrado por un grupo de profesionales para evaluar en ciertos casos, el conjunto de factores médicos y socio-económicos reveladores de "*la habilidad que posea [un obrero] después de una lesión o accidente para dedicarse a un trabajo que le produzca ingreso en forma ordinaria y de manera estable*". Su función rectora es asesorar al Administrador y proveerle elementos de juicio fundados para que éste llegue a una decisión informada y razonable respecto al potencial de trabajo remunerativo de un lesionado.

*Herrera Ramos v. Comisión Industrial,* 108 D.P.R. 316, 319 (1979) (citas omitidas).

A tales efectos, el Comité estudia, examina y evalúa, además de la incapacidad desde el punto de vista médico, factores tales como la edad, profesión, escolaridad, oportunidades de empleo en el área donde reside el obrero y otros; y oportunamente rinde un informe determinando si el lesionado puede realizar aquellos aspectos sustanciales y básicos de su trabajo, o si sus servicios son tan limitados que no hay mercado o demanda para los mismos. *Herrera Ramos v. Comisión Industrial*, 108 D.P.R. 316, 318 (1979).

El Tribunal Supremo de Puerto Rico ha reconocido que, históricamente, no ha sido fácil a los tribunales la determinación de qué significa el concepto inhabilidad o incapacidad para realizar cualquier trabajo remunerado. *Rodríguez Ortiz v. Comisión Industrial*, 90 D.P.R. 764, 773 (1964). Sin embargo, sí ha resaltado, que la jurisprudencia existente ha coincidido "*en que ello no significa que el obrero tenga que estar tan impedido o*

*inhabilitado físicamente, o que tenga una condición de salud tan ruinosa que su estado no le permita ninguna actividad, excepto mantenerse vivo."* Id. a la página 773.

Las expresiones del Tribunal Supremo son en el contexto de la Ley de Compensaciones por Accidentes del Trabajo. No obstante, dicho estatuto, al igual que otros reseñados en el caso de *Rodríguez Ortiz, supra,* tiene un lenguaje similar al que la Ley del Sistema de Retiro utiliza para describir la incapacidad total y permanente. *"[L]as lesiones que tengan por consecuencia la incapacidad total y permanente del obrero para hacer toda clase de trabajo u ocupaciones remunerativas."* 11 L.P.R.A. sec. 3(d).

En *Rodríguez Ortiz* se reseñó que bajo las leyes de compensaciones a obreros, aunque una persona fuera capaz de realizar parte de un empleo, desde el punto de vista legal, se le puede considerar como totalmente incapacitada si no puede realizar aquellos aspectos sustanciales y básicos de trabajo, o sea, que si los servicios que puede prestar son tan limitados en calidad, cantidad o en cuanto a su condición de confiables, de modo que no hay un mercado o demanda para ellos, puede considerarse a la persona como totalmente incapacitada. *Id.* a la página 772.

**V**

Al analizar las determinaciones de hechos expuestas y la evidencia aceptada por la Junta de Síndicos, que obra en el expediente, a la luz de la doctrina anteriormente reseñada, somos del criterio de que el error señalado fue cometido. La Junta de Síndicos incidió al evaluar la evidencia médica a la luz de los factores que guían la determinación de incapacidad.

Como puede advertirse, los asesores médicos de la Administración basaron su determinación de no incapacidad, en el hecho de que, individualmente, las condiciones de salud sufridas por el recurrente no igualaban los diferentes listados de incapacidad adulta de la Administración del Seguro Social. No obstante, del Reglamento Para la Concesión de Pensiones no surge que para determinar la incapacidad, las condiciones de salud reportadas deban igualar esos listados. Lo que el Reglamento indica es que si de la evidencia médica que consta en el expediente y conforme al listado de criterios médicos (*"Adult Listings"*), no se pudiese determinar con certeza la incapacidad, se podrán hacer otros estudios para esa determinación. **Véase** Regla 24.4.

Como se explica en la Parte IV de esta sentencia, el listado de criterios médicos de la Administración del Seguro Social es utilizado para hacer una determinación de incapacidad automática. Una vez se concluye que la condición iguala el listado, se determina que el solicitante está incapacitado, sin necesidad de hacer otras evaluaciones, como la capacidad residual funcional a la luz de los llamados factores vocacionales.

En el caso de autos, contrario a lo determinado por uno de los asesores del Administrador y el oficial examinador que presidió la vista de reconsideración, el recurrente sufre de una condición de asma de gran severidad. Los asesores aseguraron que en el récord no había evidencia de ataques de asma y que, por tanto, no se igualaba el listado 3.03(B). La evidencia en el expediente demuestra lo contrario. **Véanse** *supra,* las notas 1 y 2 de esta sentencia y texto que las acompaña. Aunque del récord no es posible concluir que dicho listado haya sido satisfecho, la evidencia demuestra que el recurrente sufre unas limitaciones en su diario vivir a causa de esa condición. Ha sido hospitalizado en múltiples ocasiones por ataques asmáticos, en las cuales se ha tenido que estabilizar su condición mediante el uso de medicación intravenosa. **Véase** a la nota 3. Tiene la necesidad de administrarse terapias respiratorias diariamente.

Con respecto a su condición lumbar, la evaluación de la doctora encargada de evaluar al recurrente fue en el sentido de señalar que éste podía realizar una serie de labores físicas como cargar, halar y empujar objetos de mediano peso, sostener una pluma y escribir. No obstante, dicha evaluación no demuestra que, a pesar de su condición de protución lumbar, el recurrente pueda desempeñarse en un empleo en una jornada de trabajo completa. El recurrente señaló en la vista que sufre de dolor constante, el cual ayuda a mitigar mediante el uso de

varios tipos de medicamentos, y que su condición limita considerablemente su capacidad de movimiento. El récord ante nos, adecuadamente sustenta la condición lumbosacral que padece el recurrente.

De otro lado, aunque de valor persuasivo, surge del récord que la Administración del Seguro Social concedió al recurrente beneficios por incapacidad, al hacer el análisis completo que requiere ese estatuto. Este organismo determinó que las condiciones del recurrente, afectan significativamente su capacidad para realizar trabajo de manera sostenida. **Véase** a la página 150 del apéndice de la apelación.

Por su parte, la Administración del Fondo del Seguro del Estado, a través del Comité de Factores Socioeconómicos, al evaluar los factores vocacionales del recurrente, determinó que el recurrente estaba totalmente incapacitado para realizar trabajo remunerado. Sobre este aspecto, la resolución recurrida ignora completamente esa evidencia que consta el expediente del caso, y se limita a concluir que aunque las condiciones de salud del recurrente *"limitan su funcionamiento en algunas situaciones, no lo incapacitan para realizar todo trabajo en el servicio público." Id.* a la página 44. Ello, sin explicar siquiera qué tipo de trabajos, según su criterio, puede realizar.

## VI

Por los fundamentos antes expuestos, se expide el auto solicitado, se revoca la resolución recurrida y se ordena a la Junta de Síndicos conceder al recurrente la pensión por incapacidad ocupacional solicitada.

Lo acordó el Tribunal y lo certifica la Secretaria General.

El juez Gierbolini disiente con opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2002 DTA 142

**1.** Adviértase sobre esa conclusión del medico de la Administración, que el reporte del Dr. Montaño, expuesto en el párrafo 8, señaló que el recurrente tuvo una hospitalización por asma bronquial y varias visitas a sala de emergencias, tres ataques de asma por semana, algunas veces diarias. El Listado 3.03B de la lista de incapacidades adulta de la Administración del Seguro Social, señala lo siguiente:

*"B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least **once every 2 months** or at least **six times a year**. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks."* **Véase http://www.ssa.gov/disability/professionals/bluebook/3.00-Respiratory** Adult.htm#3.03% 20Asthma. Ultima visita, 15 de agosto de 2002.

**2. Véase** nota 1, *supra*, y texto que acompaña.

**3.** Este medicamento es usado para tratar inflamaciones y se administra a través de infusiones intravenosas o inyecciones interarticulares. **Véase** http://health.yahoo.com/health/pdr_drugs/0672/0.html. Ultima visita, 15 de agosto de 2002.

### OPINION DISIDENTE DEL JUEZ GIERBOLINI – 2002 DTA 142

San Juan, Puerto Rico, a 19 de septiembre de 2002

Los hechos expuestos en la Opinión Mayoritaria emitida por este Tribunal no están en controversia. Sin embargo, entiendo que mediante la misma, los distinguidos compañeros sustituyeron el criterio de la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (en

adelante Junta de Síndicos), organismo administrativo en materia especializada, por su propio criterio, *López v. Junta de Planificación*, 80 D.P.R. 646, 673 (1958).

Como es sabido, en su función revisora, los tribunales apelativos deben ser cautelosos al intervenir con las determinaciones administrativas de los foros especializados porque las conclusiones y determinaciones de los organismos administrativos merecen gran consideración y respeto por los tribunales en la etapa de revisión judicial, *Rivera Concepción v. Administración de Reglamentos y Permisos*, ____ D.P.R. ____ (2000), **2000 J.T.S. 155**, página 160; *Assoc. Ins. Agencies, Inc. v. Com. Seg. De P.R.*, 144 D.P.R. 425, 436 (1997); *Metropolitana, S. E. v. A.R.P.E.*, 138 D.P.R. 200, 213 (1995); *Viajes Gallardo v. Clavell*, 131 D.P.R. 275, 289-290 (1992).

La revisión judicial es limitada. Sólo determina si la agencia administrativa actuó arbitraria o ilegalmente, o en forma tan irrazonable que abusó de su discreción, *Municipio de San Juan v. Junta de Calidad Ambiental*, ____ D.P.R. ____ (1999), **99 J.T.S. 152**, página 125; *T-JAC, Inc. v. Caguas Centrum Limited Partnership, S.E.*, ____ D.P.R. ____ (1999), **99 J.T.S. 60**, página 884; *Comité de Vecinos Pro-Mejoramiento, Inc. v. Junta de Planificación*, ____ D.P.R. ____ (1999), **99 J.T.S. 32**, página 732. A tenor con esta norma de deferencia, los tribunales no alteran las determinaciones de hechos de los organismos administrativos si del expediente administrativo surge evidencia sustancial que las sostenga, Sección 4.5 de la L.P.A.U., 3 L.P.R.A. Sección 2175; *Municipio de San Juan v. Junta de Calidad Ambiental*, ____ D.P.R. ____ (2000), **2000 J.T.S. 193**, página 474; *Asociación Vecinos del Hospital San Jorge v. United Medical Corporation y Gerónimo Partnership, Etc.*, ____ D.P.R. ____ (2000), **2000 J.T.S. 21**, páginas 560-561; *Domínguez Talavera v. Caguas Expressway Motors, Inc.*, ____ D.P.R. ____ (1999), **99 J.T.S. 85**, páginas 1067-1068; *García Oyola v. J.C.A.*, 142 D.P.R. 532, 540 (1997).

El propósito de la regla de evidencia sustancial, aplicable a las determinaciones de hechos de las agencias administrativas, es *"evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor,"* *López v. Junta de Planificación, supra*, página 673. Véase, además, *Reyes Salcedo v. Policía de Puerto Rico*, 143 D.P.R. 85, 95 (1997). Según nuestro Tribunal Supremo la ha definido anteriormente, evidencia sustancial *"es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión,"* *Asociación Vecinos del Hospital San Jorge v. United Medical Corporation y Gerónimo Partnership, Etc., supra*, página 561; *Ramírez Rivera v. Departamento de Salud*, ____ D.P.R. ____ (1999), **99 J.T.S. 47**, página 817; *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64, 131 (1998).

Por consiguiente, para convencer al tribunal de que la evidencia utilizada por la agencia administrativa para formular su determinación de hecho no es sustancial, la parte afectada debe demostrar que existe otra prueba en el récord que reduzca o menoscabe el valor probatorio de la evidencia impugnada hasta el punto de que no pueda ser concluido que la determinación de la agencia fue razonable de acuerdo a la totalidad de la prueba que tuvo ante su consideración, *Municipio de San Juan v. Junta de Calidad Ambiental, supra*, página 474; *Ramírez Rivera v. Departamento de Salud, supra*, página 817; *Metropolitana, S.E. v. A.R.P.E., supra*, página 213. No obstante, el tribunal debe sostener la resolución de un conflicto probatorio por parte de la agencia, siempre que ésta haya sido apoyada en una base racional, *J.R.T. v. Línea Suprema*, 89 D.P.R. 840, 849 (1964).

Antes de emitir la resolución recurrida y denegar al Sr. Carlos Hernández Pérez (en adelante Hernández) los beneficios de pensión por incapacidad ocupacional conferidos por la Ley del Sistema de Retiro de los Empleados del Gobierno de Puerto Rico, 3 L.P.R.A. Secciones 761, *et seq*, la Junta de Síndicos sopesó toda la evidencia documental, testifical y pericial que tenía ante su consideración y determinó que Hernández no estaba total y permanentemente incapacitado para realizar cualquier trabajo en el servicio público.

Aunque la Opinión Mayoritaria concluye que la Junta de Síndicos incidió al evaluar la evidencia médica a la luz de los factores que guían la determinación de incapacidad, lo cierto es que al igual que lo concluido por la Junta de Síndicos, dicha evidencia sostiene que Hernández no está total y permanentemente incapacitado para realizar cualquier trabajo en el servicio público; máxime cuando las evaluaciones e informes médicos más

recientes establecen que la prognosis de Hernández es buena, que éste no tiene la deficiencia neurológica severa que requieren los listados para determinar incapacidad y que éste nunca ha intentado volver a trabajar a pesar de que su neumólogo le ha indicado que puede hacer una vida normal. Además, cabe señalar que a preguntas del Oficial Examinador que presidió la vista administrativa ante la Junta de Síndicos, Hernández testificó que sería una opción el trabajar en alguna labor para la cual fuera readiestrado. ■

Contrario a lo resuelto por mis distinguidos compañeros en la Opinión Mayoritaria, la determinación de la Junta de Síndicos es razonable conforme a la totalidad de la prueba que tuvo ante su consideración y la misma está basada en evidencia sustancial contenida en el expediente administrativo. Por lo tanto, como este Tribunal debe ser cauteloso al intervenir con las determinaciones administrativas de los foros especializados, y como la Junta de Síndicos no actuó ni arbitraria ni caprichosamente al emitir la resolución recurrida, respetuosamente disiento de la Opinión Mayoritaria y confirmaría la resolución recurrida.

**GILBERTO GIERBOLINI**
**Juez de Apelaciones**

**ESCOLIO OPINION DISIDENTE DEL JUEZ GIERBOLINI – 2002 DTA 142**

**1.** Resolución recurrida, a la página 10.