EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| P.C.M.E. Commercial, S.E., Decemcor, S.E. | |
| Interventores-recurridos | Certiorari |
| vs. | 2005 TSPR 202 |
| Junta de Calidad Ambiental Junta de Planificación | 165 DPR ____ |
| Agencias-recurridas | |
| Monterrey, S.E. y MR (Vega Alta), Inc. | |
| Peticionarios | |

Número del Caso: CC-2004-357

Fecha: 23 de diciembre de 2005

Tribunal de Apelaciones:

      Región Judicial de San Juan

Juez Ponente:

      Hon. Dora T. Peñagarícano Soler

Abogados de la Parte Peticionaria:

      Lcda. Maretsa Rodríguez Portela
      Lcdo. Daniel Martínez Oquendo
      Lcdo. Daniel R. Martínez Aviles
      Lcdo. José R. Lázaro Paoli

Abogados de la Parte Interventora-Recurrida:

      Lcda. María L. Martínez Lamadriz
      Lcda. Vionette Benítez Quiñones
      Lcdo. Celio Cruz Caraballo

Materia: Revisión Administrativa procedente de la Junta
      de Calidad Ambiental

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

P.C.M.E. Comercial, S.E.,
Demecor, S.E.

    Interventores-recurridos

       vs.

Junta de Calidad Ambiental         CC-2004-357    CERTIORARI
Junta de Planificación

    Agencias-recurridas

Monterrey, S.E. y MR (Vega
Alta), Inc.

    Peticionarios

    OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LOPEZ

San Juan, Puerto Rico, a 23 de diciembre de 2005

El 28 de diciembre de 1992, Monte Rey, S.E. y M.R. Vega Alta, Inc. presentaron ante la Junta de Planificación una consulta de ubicación[1] para el desarrollo de un extenso proyecto residencial y comercial llamado "Comunidad Monte Rey". El mismo sería desarrollado y construido en varias fincas del Barrio Espinosa del Municipio de Vega Alta[2] con una cabida de mil veinticuatro (1,024)

---

[1] El número de consulta es el 92-10-1418-JPU.

[2] El área para el proyecto propuesto forma parte de un valle delimitado por una cadena de mogotes al norte, oeste y por el sur. En dichos mogotes existe múltiples especies de flora y fauna. Además, el Bosque Estatal de Vega bordea los terrenos objeto del proyecto.

cuerdas.[3] Como parte del trámite de dicha consulta, la Junta de Planificación, como agencia proponente, ordenó la preparación de una declaración de impacto ambiental preliminar (DIA-P)[4], la cual fue circulada a las entidades concernidas el 27 de octubre de 1994 --entre éstas la Junta de Calidad Ambiental-- para su aprobación.

Luego de varios incidentes procesales, el 3 de febrero de 1995, la Junta de Calidad Ambiental le requirió a la Junta de Planificación información adicional sobre la DIA-P, señalando que en ésta se encontraban ausentes ciertos elementos de juicio esenciales para poder realizar una evaluación adecuada del proyecto.[5] En respuesta a dicha

---

[3] El referido proyecto se compone de 4,776 unidades de vivienda de distintos tipos y costos, un centro comercial con un área de 1,677,000 pies cuadrados, edificios de oficina con un área de 200,000 pies cuadrados, y áreas recreativas y comunitarias.

[4] La orden de preparar una DIA-P fue producto, en parte, de unos comentarios sometidos por el Departamento de Recursos Naturales y Ambientales, el 24 de mayo de 1994, durante el proceso de evaluación de la consulta de ubicación para el proyecto. En dichos comentarios, el Departamento de Recursos Naturales expresó su preocupación debido a los efectos del proyecto sobre los recursos naturales del área. Entre estos, señaló la destrucción de una gran cantidad de mogotes que podrían contener su vegetación original, la presencia de sumideros, los cuerpos de agua en o adyacentes al proyecto y la inclusión de terrenos pertenecientes al Bosque Estatal de Vega que serían afectados por el desarrollo. A esos efectos, el Departamento de Recursos Naturales solicitó la preparación de una declaración de impacto ambiental, la cual debería atender dichas preocupaciones y realizar una descripción detallada de la flora y la fauna.

[5] Como parte del proceso evaluativo de la Consulta de Ubicación, el 29 de diciembre de 1994, la Junta de Planificación celebró una inspección ocular de los **(Continúa . . .)**

solicitud, la Junta de Planificación sometió ante la Junta de Calidad Ambiental un Suplemento a la DIA-P el 21 de septiembre de 1995, en el cual se tomaron en consideración los aspectos planteados en ésta.

Luego de examinar la información sometida por la Junta de Planificación y los comentarios recibidos sobre el proyecto, en especial de dos de sus opositores, P.M.C.E. Comercial, S.E. y Decemor, S.E., la Junta de Calidad Ambiental solicitó información adicional el 29 de marzo de 1996 para responder a dichos comentarios. En virtud de ello, el 16 de mayo de 1996, la Junta de Planificación sometió un Segundo Suplemento a la DIA-P con la información solicitada.

Al recibir el referido suplemento, la Junta de Calidad Ambiental publicó un Aviso anunciando la celebración de vista pública para discutir el proyecto y la disponibilidad de la DIA-P con sus dos suplementos. A esos efectos, el 24 de junio de 1996, la Junta de Calidad

---

terrenos en que se construirá el proyecto, con la participación de varias agencias gubernamentales y los recurridos P.M.C.E. Comercial, S.E. y Decemor, S.E. En virtud de dicha inspección, el 3 de marzo de 1995, el Departamento de Recursos Naturales sometió comentarios a la Junta de Planificación, a través de su Secretario, el geólogo Pedro Gelabert, sobre la inspección ocular en donde hizo seis recomendaciones, a saber: (1) definir las áreas específicas ha desarrollar; (2) hacer una investigación por toda el área de la flora y la fauna; (3) aclarar y sustentar la diferencia entre un mogote y un montículo; (4) especificar la metodología utilizada para sustentar la extensión del terreno y sus puntos; (5) demostrar que no existe especies de flora que son considerados críticos; y (6) documentar si la presencia de la boa de Puerto Rico en los terrenos del proyecto.

Ambiental celebró audiencias para dilucidar las inquietudes y asuntos concernientes al Proyecto Monte Rey, en donde participaron tanto agencias gubernamentales, estatales y federales, así como entidades y personas a favor y en contra del proyecto.[6] Por su parte, el 22 de agosto de 1996, la Oficina de Asesoramiento Científico de la Junta de Calidad Ambiental preparó un memorando, el cual contiene una serie de comentarios sobre la DIA-P y sus dos suplementos.

Así las cosas, el 15 de octubre de 1996, la Junta de Calidad Ambiental emitió una resolución en la que determinó que la DIA-P, con sus suplementos, cumplía con la Ley sobre Política Pública Ambiental, Ley Núm. 9 del 18 de junio de 1980, 12 L.P.R.A. sec. 1121 *et seq.* Asimismo, ordenó a la Junta de Planificación a preparar una declaración de impacto ambiental final (DIA-F) que incluyera los suplementos presentados ante la agencia, además de incluir los comentarios y recomendaciones sometidas por las diversas agencias y el público en general. De igual forma, le requirió que respondiera a dichos comentarios y recomendaciones, y si algunos de

---

[6] Resulta importante señalar que el Departamento de Recursos Naturales no compareció a la vista pública ni sometió ningún comentario ante la Junta de Calidad Ambiental sobre la DIA-P y sus dos suplementos.

éstos no ameritaban respuesta, se tenía que indicar la razón para sostener esa conclusión.[7]

De otra parte, el 13 de mayo de 1997, P.M.C.E. Comercial, S.E. y Decemor, S.E. sometieron ante la Junta de Calidad Ambiental una copia de un memorando de la División de Patrimonio Natural del Departamento de Recursos Naturales sobre el proyecto que aquí nos concierne, con el propósito de que se evaluara e incorporara al análisis de la DIA-P ante su consideración. Este memorando indicaba que la DIA-P del proyecto Monte Rey no contenía la información básica necesaria ya que había que realizar más estudios para evaluar adecuadamente el impacto ambiental que podría causar la acción propuesta.[8]

---

[7] P.M.C.E. Comercial, S.E. y Decemor, S.E., inconformes con la orden emitida por la Junta de Calidad Ambiental, solicitaron oportunamente reconsideración a la misma. Esta les fue denegada por medio de una resolución emitida el 12 de diciembre de 1996. Éstos, procedieron entonces a presentar un recurso de revisión de decisión administrativa ante el Tribunal de Apelaciones (recurso número KLRA9600443). El 11 de junio de 1998, el Tribunal de Apelaciones emitió una resolución en dicho caso denegando la expedición del recurso por carecer de jurisdicción, ya que la decisión de la Junta de Calidad Ambiental era una de carácter interlocutoria.

[8] En específico, el referido memorando planteaba lo siguiente: (1) hacer estudios más detallados sobre la flora y la fauna en los mogotes afectados por el proyecto porque no se descartaba la posible presencia de especies raras, vulnerables o en peligro de extinción; (2) hacer un estudio nocturno de la Boa de Puerto Rico; (3) hacer una búsqueda minuciosa de la herpetofauna; (4) considerar los mogotes como un corredor natural; (5) no se debe permitir la utilización del Bosque de Vega para intereses particulares.

El 16 de junio de 1997, la Junta de Calidad Ambiental denegó la solicitud de incorporar al expediente de la declaración de impacto ambiental preliminar el referido memorando, porque no era un documento oficial del Departamento de Recursos Naturales y, además, se presentó fuera del término establecido en su reglamento.

Inconformes con esa decisión, el 30 de octubre de 1997, P.M.C.E. Comercial, S.E. y Decemor, S.E. presentaron un recurso de revisión de decisión administrativa (recurso número KLRA97-00708), ante el entonces Tribunal de Circuito de Apelaciones. En el mismo alegaron que la Junta de Calidad Ambiental incidió al denegar la inclusión en el expediente administrativo del memorando preparado por la División de Patrimonio Natural del Departamento de Recursos Naturales.

Estando pendiente el referido recurso, la Junta de Planificación preparó y sometió ante la Junta de Calidad Ambiental la DIA-F solicitada, en la cual se incorporaron la DIA-P, los dos suplementos y los comentarios recibidos con sus respuestas. Posteriormente, el 1ro de diciembre de 1998, la Junta de Calidad Ambiental emitió una resolución, en la que determinó que en la DIA-F se discutía adecuadamente los posibles efectos ambientales del proyecto propuesto e incluyó una carta con una serie de recomendaciones con el propósito de una mejor realización del mismo. A esos efectos, el 24 de diciembre de 1998, se publicó el aviso ambiental en un diario de circulación

general, notificando a la ciudadanía sobre la disponibilidad de la DIA-F en la Junta.

Por otro lado, el 12 de mayo de 1999, el Tribunal de Circuito de Apelaciones emitió sentencia en el caso KLRA97-00708, en la cual concluyó que el trámite administrativo ante la Junta de Calidad Ambiental, respecto a la DIA-P, había sido deficiente, debido a que no se había incorporado al expediente administrativo del proyecto ante la agencia el memorando preparado por la División de Patrimonio Natural del Departamento de Recursos Naturales. En vista de ello, el foro apelativo intermedio ordenó a la Junta de Calidad Ambiental que considerara, e incorporara al expediente administrativo del proyecto, el referido memorando.

En virtud de la sentencia emitida por el tribunal apelativo, el 24 de octubre de 2000, la Junta de Calidad Ambiental emitió una nueva resolución en la que consideró e incorporó el memorando del Departamento de Recursos Naturales. En dicha resolución, la Junta de Calidad Ambiental determinó que el memorando sólo se refería a la DIA-P y que éste no había tomado en consideración los otros documentos que se habían sometido, tales como, DIA-F, los dos suplementos y las respuestas a los comentarios sometidos sobre el proyecto. La Junta de Calidad Ambiental procedió, entonces, a discutir cada uno de los señalamientos contenidos en el memorando del Departamento de Recursos Naturales, determinando que éstos ya se habían

considerado en la DIA-F y que no se justificaba alterar su determinación. En vista de ello, la Junta de Calidad Ambiental reiteró su resolución del 1 de diciembre de 1998, determinando que la DIA-F discutía adecuadamente los posibles efectos ambientales del proyecto propuesto.

Inconformes con esa determinación, el 19 de enero de 2001, P.M.C.E. Comercial, S.E. y Decemor, S.E., presentaron un nuevo recurso de revisión de decisión administrativa ante el Tribunal de Apelaciones (KLRA01-00044), en el que, en síntesis, alegaron que la Junta de Calidad Ambiental había incumplido con la sentencia previa del foro apelativo intermedio y con la función fiscalizadora que le impone la Ley sobre Política Pública Ambiental; esto al no considerar adecuadamente el memorando del Departamento de Recursos Naturales antes de aprobar la DIA-P del proyecto propuesto ya que estaba obligada a requerirle a la Junta de Planificación un estudio detallado sobre varios aspectos ambientales recomendados en dicho documento.

Así las cosas, Monte Rey, S.E. y M.R. Vega Alta, Inc. presentaron una moción de desestimación ante el foro apelativo intermedio alegando que el recurso de revisión presentado tenía un apéndice incompleto por carecer de una copia de la DIA-F. La misma no fue acogida por el foro apelativo intermedio ante la posibilidad de que los planteamientos de los recurrentes no requirieran la evaluación de una DIA-F. No obstante esa determinación, el

29 de junio de 2001, el foro apelativo intermedio emitió sentencia desestimando el recurso de revisión presentado por tener el mismo un apéndice incompleto, ya que entendía que la DIA-F era un documento esencial para resolver la controversia que giraba en torno a si la Junta de Calidad Ambiental había cumplido con su función fiscalizadora.

Inconforme con dicha determinación, el 1 de octubre de 2001, P.M.C.E. Comercial, S.E. y Decemor, S.E. presentaron recurso de certiorari ante este Tribunal alegando que el foro apelativo intermedio incidió al haber desestimado el recurso de revisión por tener un apéndice incompleto. Expedimos el recurso; el 15 de enero de 2003, emitimos Sentencia (Caso Núm.CC-2001-770) revocatoria, en la que dejamos sin efecto la decisión del foro apelativo intermedio, en vista de que la DIA-F no era esencial para dilucidar el planteamiento de las peticionarias. Devolvimos el caso al foro apelativo intermedio para la continuación de los procedimientos.

Una vez devuelto el caso, el 27 de febrero de 2004, el Tribunal de Apelaciones emitió una Sentencia revocando la DIA-F aprobada por la Junta de Calidad Ambiental y ordenando que se cumpliera con lo estipulado en el memorando del Departamento de Recursos Naturales. Fundamentó su determinación en que la Junta de Calidad había incumplido con la sentencia anterior emitida por ese mismo foro, el 12 de mayo de 1999, al no considerar adecuadamente el referido memorando, ya que no le requirió

a la Junta de Planificación llevar a cabo los estudios señalados en éste. El foro apelativo intermedio determinó que la Junta de Calidad Ambiental lo que hizo en su resolución fue justificar la determinación de aprobar la DIA-F para tratar de cubrir su inacción con respecto a los serios cuestionamientos en torno a los problemas de la declaración de impacto ambiental.

Inconformes con la referida determinación, Monte Rey, S.E. y M.R. Vega Alta, Inc. recurrieron, oportunamente, ante este Tribunal mediante petición de *certiorari* alegando, en síntesis y en lo pertinente, que erró el foro apelativo intermedio al resolver que la Junta de Calidad Ambiental se negó a cumplir con una sentencia anterior dictada por éste al no cumplir con lo estipulado en un memorando interno del Departamento de Recursos Naturales y con la función fiscalizadora que le impone la Ley sobre Política Pública Ambiental.

Expedimos el recurso. Contando con la comparecencia de las partes, y estando en condición de resolver el mismo, procedemos a así hacerlo.

I

La Constitución del Estado Libre Asociado de Puerto Rico dispone en su Artículo VI, Sección 19, que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor

desarrollo y aprovechamiento de los mismos para el mayor beneficio general de la comunidad..."

La Asamblea Legislativa, en virtud del referido mandato constitucional, aprobó la Ley Núm. 9 de 18 de junio de 1970[9], conocida como Ley sobre Política Pública Ambiental, según enmendada, 12 L.P.R.A. sec. 1121 et seq., la cual procede sustancialmente de la National Enviromental Policy Act of 1969 (NEPA), 43 U.S.C.A. sec. 4321 et seq.[10] Esta pieza legislativa se creó para, entre otras cosas, "atender de modo integral los asuntos concretos que se plantean en el país en relación con la administración del medio ambiente." (Citas omitidas) Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908 (1998).

A los fines de cumplir con el propósito de implantar la política pública ambiental, la Ley Núm. 9, ante, creó

---

[9] Cabe destacar que la Ley Núm. 9, ante, fue derogada por la Ley Núm. 416 de 22 de septiembre de 2004, conocida como Ley sobre Política Pública Ambiental de 2004, 12 L.P.R.A. sec. 8001 et seq. No obstante lo anterior, para resolver la controversia ante nuestra consideración aplicaremos las disposiciones de la derogada Ley Núm. 9, ante, ya que la recién aprobada Ley Núm. 416, ante, dispone en lo pertinente que:

> Todo proceso *cuasi* judicial, administrativo, adjudicativo, etc. ya comenzado o pendiente antes de la vigencia de esta ley se regirán por las leyes, reglamentos y órdenes aquí derogadas conforme a la ley aplicable al momento de ocurrir aquellos hechos o eventos que provocaron dichos procesos. 12 L.P.R.A. sec. 8007f.

[10] La jurisprudencia interpretativa de la NEPA constituye una fuente persuasiva de gran peso al momento de interpretar la Ley Núm. 9. Misión Ind. P.R. v. J.C.A., ante, a las pág. 920.

la Junta de Calidad Ambiental. 12 L.P.R.A. sec. 1122(d). Entre las responsabilidades a su cargo, la Junta de Calidad Ambiental tiene la obligación de evaluar las acciones gubernamentales que impacten el medio ambiente, mediante un procedimiento de consultas u opiniones, en el cual participa activamente. 12 L.P.R.A. sec. 1124.

En vista de ello, el Artículo 4(c) de la Ley Núm. 9, ante, exigía que los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades del Estado Libre Asociado presenten ante la Junta de Calidad Ambiental para su aprobación una declaración de impacto ambiental (DIA), escrita y detallada, "antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente..." 12 L.P.R.A. sec. 1124(c). Véase también: Misión Ind. P.R. v. J.C.A., ante, a las pág. 922; García Oyola v. J.C.A., 142 D.P.R. 532, 540 (1997). Por tanto, la "fiscalización no sólo queda en manos de una entidad distinta a la que propone el proyecto en cuestión, sino [que] además ... queda en manos de una entidad especializada en asuntos ambientales, cuya función principal es precisamente velar por el fiel cumplimiento de la política pública ambiental de Puerto Rico". Misión Ind. P.R. v. J.C.A., ante, a la pág. 928; Véase también: T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70 (1999).

El objetivo que persigue la preparación de la DIA es dual, a saber: (1) que la agencia proponente haya estudiado concienzudamente las consecuencias ambientales significativas del proyecto en cuestión, y (2) que las partes concernidas estén informadas de dichas consecuencias ambientales. No obstante, ello no obliga a la agencia proponente a discutir impactos insignificantes, improbables o especulativos, sino aquellos que un perito en la materia entienda deban señalarse. Misión Ind. P.R. v. J.C.A., ante, a la pág. 924. Por lo que "la agencia proponente debe realizar un esfuerzo serio y escrupuloso por identificar y discutir todas las consecuencias ambientales de importancia que sean previsibles". (Énfasis suprimido) Ibid.

Al evaluar la adecuacidad de una DIA, la Junta de Calidad Ambiental no tiene que llevar a cabo "un análisis matemático preciso o perfecto que garantice que el proyecto propuesto no ha de tener impacto ambiental adverso alguno. Lo que se persigue es que la declaración de impacto ambiental provea información suficiente que ponga en perspectiva las consecuencias, tanto favorables como desfavorables, de la acción gubernamental propuesta". (Cita omitida). Misión Ind. P.R. v. J.C.A., ante, a la pág. 928.

En fin, antes de plasmar su aprobación, la Junta de Calidad Ambiental, como custodio del medio ambiente, tiene la responsabilidad de velar por que la DIA presentada ante

su consideración cumpla cabalmente con todos los requisitos --tanto sustantivos como procesales-- impuestos por el Art. 4(c) de la Ley Núm. 9, ante, y sus reglamentos. 12 L.P.R.A. sec. 1124(c); Misión Ind. P.R. v. J.C.A., ante, a la pág. 922. Cabe aclarar que la función de la Junta de Calidad Ambiental no es autorizar o desautorizar el proyecto que ha de desarrollarse, sino determinar si la declaración de impacto ambiental es apta para la acción que se quiere realizar. Véase: Misión Ind. P.R. v. J.C.A., ante, a la pág. 948.

La preparación y aprobación de una DIA es una etapa preliminar en la que se garantiza "que la conservación y el uso racional de los recursos naturales han de tenerse propiamente en cuenta al momento de hacer planes y tomar las primeras decisiones gubernamentales sobre una propuesta que pueda tener un impacto en el medio ambiente". Misión Ind. P.R. v. J.C.A., ante, a la pág. 925. En fin, la DIA es un mecanismo de planificación, o sea, el primer escalón en el largo proceso de la obtención de permisos y autorizaciones oficiales del proyecto propuesto. Ibid.

No obstante, su aprobación no conlleva que no se tomen otras medidas ulteriores para la protección del ambiente. Incluso, posterior a la aprobación de la DIA, o luego de comenzado el proyecto, si éste no se lleva conforme a la DIA, o si las consecuencias ambientales son mayores que las previstas, o si surgen efectos adversos no

anticipados, la Junta de Calidad Ambiental puede y debe tomar las medidas necesarias para evitar cualquier daño adicional al ambiente. Misión Ind. P.R. v. J.C.A., ante, a la pág. 925.

En resumen, pues, una declaración de impacto ambiental es el instrumento que provee nuestro ordenamiento jurídico para asegurar que la conservación y el uso racional de los recursos naturales han de tenerse propiamente en cuenta al momento de hacer planes y de tomar las primeras decisiones gubernamentales.

II

Por otro lado, la propia Ley Núm. 9, ante, expresamente disponía el alcance de la intervención judicial en casos como el de autos: ésta ordenaba que la revisión judicial se habría de llevar a cabo a base del expediente administrativo de los procedimientos ante la Junta de Calidad Ambiental, y que las determinaciones de hechos de ésta serán concluyentes si están sostenidas por evidencia sustancial. 12 L.P.R.A. sec. 1134(g). En virtud de ello, hemos expresado que se trata, pues, del mismo alcance que tiene la revisión judicial respecto a las decisiones de cualquier otra agencia administrativa. Misión Ind. P.R. v. J.C.A., ante, a la pág. 929; Véase también: 3 L.P.R.A. sec. 2175.

A tono con lo anterior, para poder analizar las cuestiones planteadas desde su justa perspectiva, debemos

esbozar varios principios que constituyen el marco conceptual de la revisión judicial de las decisiones administrativas.

El propósito primordial de dicha revisión consiste en demarcar el ámbito de discreción de las agencias administrativas y cerciorarse que éstas ejecuten sus funciones de acuerdo con la ley. L.P.C. & D., Inc. v. A.C., 149 D.P.R. 869 (1999); Mun. de San Juan v. J.C.A., 149 D.P.R. 263, 279 (1999); Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998).

Como es sabido, en el crisol judicial, las decisiones o resoluciones, al igual que las interpretaciones de las agencias administrativas, merecen gran consideración y respeto. Otero Mercado v. Toyota de Puerto Rico Corp., res. 3 de febrero de 2005, 2005 T.S.P.R. 8; Rebollo Vda. de Liceaga v. Yiyi Motors, Motor Ambar,Inc., res. 13 de enero de 2004, 2004 T.S.P.R. 2; Rivera Concepción v. A.R.P.E., 152 D.P.R. 116 (2000); Castillo v. Depto. del Trabajo, 152 D.P.R. 91 (2000); Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70 (2000). Esta deferencia judicial a las decisiones administrativas se debe a que son las agencias las que cuentan con el conocimiento experto y con la experiencia especializada de los asuntos que les son encomendados. Ibid.

En virtud de esta deferencia, los tribunales no deben alterar las determinaciones de hecho suscritas por las agencias administrativas "si se basan en evidencia

sustancial que obra en el expediente administrativo" considerado en su totalidad. Sec. 4.5. de la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2175.[11] Hemos reiterado en numerosas ocasiones que evidencia sustancial es "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". Asoc. Vec. H. San Jorge v. U. Med. Corp., ante, a la pág. 75; Misión Ind. P.R. v. J.P., ante, a la pág. 131; Hilton Hotels v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953).

El propósito primordial de la doctrina de la evidencia sustancial es "evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor". (Énfasis suplido) P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. 269, 282 (2000); Misión Ind. P.R. v. J.P., ante; Reyes Salcedo v. Policía de P.R., 143 D.P.R. 85, 95 (1997). De igual forma, no les corresponde a los tribunales pasar juicio sobre los conflictos de prueba entre opiniones especializadas o científicas. Véase: Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 940 (1998).

Correlativo con ello, hemos señalado que los procedimientos y las decisiones de las agencias

---

[11] Véase también: Rivera Concepción v. A.R.P.E., 152 D.P.R. 116 (2000); P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. 269 (2000); Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70, 75 (2000); Costa, Piovanetti v. Caguas Expressway, 149 D.P.R. 881, 889 (1999).

administrativas están cobijadas por una presunción de regularidad y corrección. Ramírez v. Depto. de Salud, 147 D.P.R. 901 (1999); Com. Vec. Pro-Mej., Inc. v. J.P., 147 D.P.R. 750 (1999); Misión Ind. P.R. v. J.P., ante; Maisonet v. F.S.E., 142 D.P.R. 194 (1996). Por lo tanto, aquel que aduzca lo contrario tiene que presentar prueba suficiente que derrote dicha presunción. Ramírez v. Depto. de Salud, ante; Com. Vec. Pro-Mej., Inc. v. J.P., ante; Misión Ind. P.R. v. J.P., ante.

De esta manera, la parte que impugne las determinaciones de hechos de la agencia tiene que convencer al foro judicial de que la evidencia en la cual se apoyó ésta para formular tales determinaciones no es sustancial. A esos efectos, hemos expresado que la parte:

> Debe demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración.[12]

Por otra parte, las conclusiones de derecho emitidas por las agencias administrativas son revisables en su totalidad. Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme, ante. Ello no implica, sin embargo, que los tribunales, sin razón alguna, puedan rechazar las conclusiones de derecho de las agencias administrativas e impongan su criterio. Otero Mercado v.

---

[12] Misión Ind. P.R. v. J.P., ante, a la pág. 131.

Toyota de Puerto Rico Corp., ante. De ordinario, los tribunales conceden gran peso y deferencia a las interpretaciones que dichos organismos realizan de las leyes que les corresponde administrar. Como anteriormente indicáramos, las agencias administrativas, contrario a los tribunales, "cuentan con experiencias y conocimientos altamente especializados sobre los asuntos que se le encomiendan". Rivera Concepción v. A.R.P.E., ante, a la pág. 123.[13] Además, "las agencias administrativas son instrumentos necesarios para la interpretación de la ley". P.R.T.C. v. J. Reg. Tel. de P.R., ante, a la pág. 283; Misión Ind. P.R. v. J.P., ante, a la pág. 130.

Así también, es meritorio precisar que la interpretación de una ley por la agencia encargada de velar por su cumplimiento no tiene que ser la única razonable. Sin embargo, incluso en casos dudosos, la interpretación de la agencia merece la referida deferencia. Véase: P.R.T.C. v. J. Reg. Tel. de P.R., ante, a la pág. 283; Misión Ind. P.R. v. J.P., ante, a la pág. 133.

No obstante lo anterior, los tribunales se abstendrán de avalar una decisión administrativa si la agencia: (1) erró al aplicar la ley[14]; (2) actuó arbitraria, irrazonable

---

[13] Véase: Castillo v. Depto. del Trabajo, 152 D.P.R. 91, 96 (2000); Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998).

[14] Castillo v. Depto. del Trabajo, ante.

o ilegalmente, o (3) lesionó derechos constitucionales fundamentales.[15]

En resumen, el criterio que debemos aplicar no es si la decisión administrativa es la más razonable o la mejor; es, repetimos, si la determinación de la agencia, en interpretación de los reglamentos y las leyes que le incumbe implementar, es una razonable. Véase: Rivera Concepción v. A.R.P.E., ante, a la pág. 124. Por lo tanto, carente de irrazonabilidad o ilegalidad, no nos compete imponer nuestro criterio motivado por razones foráneas, ni pasar juicio sobre la sabiduría de una determinación de política pública ambiental que le corresponde a otra rama gubernamental. Véase: Misión Ind. P.R. v. J.P., ante, a la pág. 129 esc. 39; . Misión Ind. P.R. v. J.C.A., ante, a las págs. 940, 945.

En virtud de lo anterior, y en lo que respecta a la controversia ante nuestra consideración, son muy ilustrativas las expresiones del Tribunal Supremo de Estados Unidos en el caso Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519 (1978), en donde se analizó la revision judicial bajo la National Enviromental Policy Act of 1969 (NEPA), ante, ley modelo en la que se basa nuestra Ley sobre Política Pública Ambiental, ante. El Tribunal Supremo de Estados Unidos expresó:

> "NEPA does set forth significant substantive goals for the Nation, but its mandate to the

---

[15] Rivera Concepción v. A.R.P.E., ante.

agencies is essentially procedural. It is to insure a fully informed and well-considered decision, <u>not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency</u>. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, <u>not simply because the court is unhappy with the result reached</u>." (Citas omitidas y énfasis suplido.) <u>Vermont Yankee Nuclear Power Corp.</u> v. <u>NRDC</u>, ante, a la pág. 558.

III

En la controversia presentada ante nos, debemos determinar si la Junta de Calidad Ambiental, al aprobar la DIA-F, incumplió con la sentencia emitida por el Tribunal de Apelaciones, el 12 de mayo de 1999 (KLRA97-00708). En la misma el foro apelativo intermedio le había ordenado a dicha agencia que <u>considerara e incorporara</u> al expediente administrativo del proyecto "Comunidad Monte Rey", el memorando del 20 de diciembre de 1996 de la División de Patrimonio Natural del Departamento de Recursos Naturales.

Los recurridos P.M.C.E. Comercial, S.E. y Decemor, S.E. sostienen, <u>como único fundamento para impugnar la determinación de la agencia</u>, que la Junta de Calidad Ambiental actuó irrazonablemente e incumplió con la sentencia del foro apelativo intermedio ya que para verdaderamente incorporar y considerar el memorando estaba obligada a ordenarle a la Junta de Planificación hacer los estudios que se plantearon en el mismo por el Departamento

de Recursos Naturales antes de aprobar la DIA-F. No le asiste la razón.

De entrada, debemos señalar que en ninguna parte de la sentencia dictada por el Tribunal de Apelaciones se le ordenó a la Junta de Calidad Ambiental realizar los estudios recomendados en el memorando del Departamento de Recursos Naturales.[16] El foro apelativo intermedio lo que le ordenó a la agencia fue, repetimos, incorporar y considerar el referido memorando. Procede, entonces, evaluar si a la luz de la totalidad del expediente administrativo, la actuación de la Junta de Calidad Ambiental, al reafirmarse en su aprobación de la DIA-F sin llevar cabo los estudios que se recomendaban en el memorando, fue irrazonable. Veamos.

La Junta de Calidad Ambiental emitió una nueva resolución, el 24 de octubre de 2000, reafirmándose en la aprobación de la DIA-F y en la que consideró e incorporó el memorando del Departamento de Recursos Naturales. En dicha resolución, la Junta de Calidad Ambiental determinó

---

[16] En la disposición del caso el foro apelativo intermedio expresó lo siguiente:

"Por los fundamentos anteriormente expuestos, se revoca la resolución emitida el 16 de junio de 1997 por la Junta de Calidad Ambiental. Asimismo, se ordena incorporar el informe preparado el 20 de diciembre de 1996 por la División de Patrimonio Natural del Departamento de Recursos Naturales al expediente administrativo que dicha agencia lleva sobre la consulta de ubicación número 92-10-1418-JPU."

que el memorando sólo se refería a la DIA-P y que no se había tomado en consideración los otros documentos presentados posteriormente que formaban parte del expediente administrativo, tales como, la DIA-F, los dos suplementos y las respuestas a los comentarios que se habían sometido sobre el proyecto.[17]

No obstante lo anterior, la Junta de Calidad Ambiental en su resolución procedió, entonces, a discutir cada uno de los señalamientos contenidos en el memorando del Departamento de Recursos Naturales, determinando que éstos ya se habían considerado en la DIA-F y que no se justificaba alterar su determinación ni realizar nuevos estudios.

El referido memorando tenía varios señalamientos específicos sobre la DIA-P, a saber: (1) debían hacerse estudios más detallados sobre la flora y la fauna en todos los mogotes porque no se descartaba la posible presencia de especies raras, vulnerables o en peligro de extinción; (2) incluir un estudio nocturno de la Boa de Puerto Rico; (3) hacer una búsqueda minuciosa de la herpetofauna; (4)

---

[17] Un examen minucioso del referido memorando nos convence que la Junta de Calidad Ambiental tenía razón al indicar que éste se refería sólo a la DIA-P y no había tomado en cuenta los otros documentos que se habían presentado ante la agencia que posiblemente podían contestar muchas de las interrogantes del Departamento de Recursos Naturales. De una lectura del mismo podemos ver que los señalamientos contenidos en el memorando se refieren a la DIA-P y en ningún momento se hace referencia ni se mencionan los documentos que se presentaron posteriormente ante la Junta de Calidad Ambiental.

se faltó considerar los mogotes como un corredor natural; y (5) no se debe permitir la utilización del Bosque de Vega para el beneficio de intereses particulares. <u>Veamos como la Junta de Calidad Ambiental en la resolución emitida consideró cada uno de los señalamientos del memorando</u>.

**1. Estudios de flora y fauna de todos los mogotes**

La Junta de Calidad Ambiental expresó en su resolución que ya la Junta de Planificación había atendido ese señalamiento en los dos suplementos y en la DIA-F presentada en virtud de que se había establecido que el 97% de <u>todos</u> los mogotes iban a ser conservados y no se iban a afectar por el proyecto y el 100% de los mogotes de gran altura no se iban a tocar. Como consecuencia, la Junta de Calidad Ambiental entendió que no era necesario estudiar todos los mogotes, sino sólo los que se iban afectar por el proyecto.

Por lo tanto, la Junta de Calidad Ambiental aceptó como adecuados los estudios realizados por la Junta de Planificación, como agencia proponente, de los mogotes que serían afectados. Conforme a ello, señaló que en la DIA-F se escogieron tres mogotes representativos de las condiciones relevantes, a saber: (1) altos, aislados y bien conservados; (2) altos, continuos y bien conservados; (3) bajos, aislados y perturbados. Sin embargo, los estudios realizados no se quedaron ahí sino que conforme a

la DIA-F se inspeccionaron los otros mogotes que serían afectados por el proyecto.

Asimismo, de la DIA-F surge que el estudio de la flora y la fauna incluyó la totalidad de los terrenos que iban a ser utilizados para el proyecto. En la DIA-F se señaló todas las especies que se encontraron en dicho estudio sobre la flora y la fauna y se expresó, además, la manera en que iban a ser impactados y ofreció alternativas para su protección.

Conforme a lo anterior, la Junta de Calidad Ambiental entendió que el estudio de la flora y la fauna, incluyendo el de los mogotes, era adecuado y que no era necesario hacer los estudios que señalaba el memorando del Departamento de Recursos Naturales ya que los mismos se habían hecho. Somos del criterio que dicha determinación es una razonable; sería ilógico tener que exigir un estudio de todos los mogotes cuando la mayoría de ellos no van a ser afectados por el proyecto.

**2. Estudio nocturno de la Boa de Puerto Rico**

La Junta de Calidad Ambiental en su resolución expresó que ya se habían realizado los estudios de los ecosistemas que incluyeron la totalidad de los terrenos. Se determinó que la boa de Puerto Rico se encuentra en las

áreas que van a ser conservadas, por lo que ésta no se verá afectada por el proyecto.[18]

### 3. Búsqueda minuciosa de la herpetofauna

La Junta de Calidad Ambiental en su resolución expresó que en la DIA-F se discutió adecuadamente este planteamiento ya que sólo se encontraron cuatro anfibios y que no se encontró ninguna culebra en los estudios que se hicieron en los terrenos afectados por el proyecto. Aunque en el memorando se expresaba que posiblemente podía haber otras especies de anfibios, la Junta de Calidad Ambiental señaló que la Junta de Planificación discutió adecuadamente ese punto porque demostró que en los terrenos del proyecto, debido a su alta percolación y a que no existen cuerpos de agua superficiales, el número de anfibios es más reducido que en otras zonas. De esta forma, la Junta de Calidad Ambiental entendió que, como ya se había realizado el estudio sobre la herpetofauna, resultaba innecesario volver a hacerlo.

### 4. Considerar los mogotes como un corredor natural

En el memorando del Departamento de Recursos Naturales se hace este señalamiento por la preocupación de que los mogotes aislados actuaban como un corredor natural

---

[18] Para ello, en la resolución se cita extensamente las porciones de la DIA-F y del Segundo Suplemento en que se discute este señalamiento.

para la fauna del área y su destrucción podía ocasionar una fragmentación de las poblaciones de animales. La Junta de Calidad Ambiental señaló, en la resolución que emitiera, que esta preocupación había sido atendida ya que se proveyeron medidas para proteger la fauna en los mogotes aislados. Entre estas medidas, se señaló, que se iba a proveer unas avenidas de árboles para las aves y otra clase de fauna que se encuentran en los mogotes aislados.

### 5. La utilización del Bosque de Vega para el beneficio de intereses particulares

En cuanto a este punto, la Junta de Calidad Ambiental señaló que esta preocupación también se había discutido en la DIA-F. A esos efectos, señaló que el Bosque de Vega no se iba a utilizar para el beneficio de intereses particulares. Expresó, además, que lo único que se pretendía hacer era una calle, la cual había sido propuesta por el Municipio de Vega Alta, lo que implicaba que ello conllevaba un interés público. Por último, señaló que la misma se iba a realizar en unos terrenos llanos, con escasa vegetación, por lo que el impacto ecológico del mismo era reducido.

Por otro lado, la Junta destacó que la acción propuesta contemplaba la cesión de once punto siete (11.7) cuerdas de terrenos con mogotes para ser integrados al Bosque de Vega, por lo que el proyecto resultaría en una

ampliación del mismo. Señaló, además, que también el proyecto contemplaba la cesión de otras sesenta (60) cuerdas de terrenos con mogotes localizados en las cercanías del Bosque.

IV

En virtud de lo anteriormente expuesto, y luego de examinar minuciosamente el expediente administrativo, concluimos que la determinación de la Junta de Calidad Ambiental está sustentada por evidencia sustancial. Determinamos, además, que la actuación de la Junta de Calidad Ambiental, al considerar cada uno de los señalamientos del memorando del Departamento de Recursos Naturales, fue una razonable y cónsona con la sentencia emitida por el Tribunal de Apelaciones. La conclusión de la Junta de Calidad Ambiental, a los efectos de que los estudios señalados en el memorando no eran necesarios porque ya se habían realizado, es una razonable. Resolvemos, en consecuencia, que la agencia no incurrió en abuso de discreción al así actuar.

Como indicáramos anteriormente, los procedimientos y las decisiones de las agencias administrativas están cobijadas por una presunción de regularidad y corrección. Otero Mercado v. Toyota de Puerto Rico Corp., ante. Los recurridos P.M.C.E. Comercial, S.E. y Decemor, S.E. no han derrotado dicha presunción mediante evidencia a esos efectos. Su único fundamento para impugnar la decisión de

la Junta de Calidad Ambiental --que ésta venía obligada por la sentencia emitida por el Tribunal de Apelaciones a requerir de la Junta de Planificación que procediera a realizara los estudios que se señalaron en el memorando del Departamento de Recursos Naturales-- no es correcto. Los recurridos no han demostrado que de la totalidad del expediente administrativo surja otra prueba que nos lleve a concluir que la determinación de la Junta de Calidad Ambiental fue irrazonable.

Según mencionáramos anteriormente, la función de la Junta de Calidad Ambiental no es autorizar o desautorizar un proyecto que ha de desarrollarse, sino determinar si la declaración de impacto ambiental es apta para la acción que se quiere realizar. Tomando en consideración lo anterior, somos del criterio que existe evidencia suficiente en el expediente administrativo para determinar que la agencia no actuó irrazonablemente al determinar que la declaración de impacto ambiental final era adecuada.

IV

Por los fundamentos antes expuestos, se revoca la sentencia emitida por el Tribunal de Apelaciones y se devuelve el caso a la agencia recurrida para ulteriores procedimientos consistentes con lo aquí resuelto.

Se dictará Sentencia de conformidad.


FRANCISCO REBOLLO LÓPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

P.C.M.E. Comercial, S.E.,
Demecor, S.E.

    Interventores-recurridos

       vs.

Junta de Calidad Ambiental         CC-2004-357    CERTIORARI
Junta de Planificación

    Agencias-recurridas

Monterrey, S.E. y MR (Vega
Alta), Inc.

    Peticionarios


SENTENCIA

San Juan, Puerto Rico, a 23 de diciembre de 2005


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida en el presente caso por el Tribunal de Apelaciones y se devuelve el caso a la Junta de Calidad Ambiental para ulteriores procedimientos consistentes con lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Fiol Matta disiente sin opinión escrita. El Juez Presidente señor Hernández Denton inhibido. La Juez Asociada señora Rodríguez Rodríguez no interviene.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo